**Jeanne McGlory WALLACE,**
**Plaintiff-Appellee,**

v.

**CITY OF NEW ORLEANS, et al.,**
**Defendants-Appellants.**

No. 80–3189.

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 31, 1981.

---

Ralph D. Dwyer, Jr., New Orleans, La., for defendants-appellants.

William J. Guste, III, New Orleans, La., for plaintiff-appellee.

Before THORNBERRY, COLEMAN and AINSWORTH, Circuit Judges.

COLEMAN, Circuit Judge.

The Civil Service Commission of the City of New Orleans appeals a judgment in favor of Jeanne McGlory Wallace in a sex discrimination suit now grounded solely on 42 U.S.C., Section 1983. We reverse.

On May 16, 1977, Jeanne McGlory Wallace filed her suit against the City of New Orleans; Moon Landrieu, Mayor of the City; Clarence B. Giarrusso, Superintendent of Police; and the members of the New Orleans Civil Service Commission, an entity established by the Louisiana Constitution. She sought redress of an alleged deprivation of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e et seq., 42 U.S.C., Sections 1981 and 1983, and the Fifth and Fourteenth Amendments to the United States Constitution. She sought declaratory and injunctive relief against sex and/or race discrimination in employment, including seniority and back pay.

On December 6, 1977, an offer of judgment was filed in District Court in which the City, the Mayor, and the Superintendent of the Police Department allowed the plaintiff to take judgment against them. There, Ms. Wallace received $4,946.96 in compromise of the back pay claims [1] and for purposes of seniority benefits and state supplementary pay she was to be considered as having been hired by the New Orleans Police Department as a police officer on Janu-

1. The settlement awarded was a result of a compromise reached by the parties in which Ms. Wallace received salary pay of a police officer back to 1975 rather than to the year 1973 as originally sought.

ary 22, 1973.[2] Finally, the New Orleans Police Department records were to reflect that Ms. Wallace had sufficient seniority as of November 29, 1976 to qualify and be eligible to take the sergeant's examination to be given on December 11, 1976.

The Civil Service Commission was not a party to this settlement and, of course, was not a party defendant named in the judgment. The judgment accordingly had no effect upon the Civil Service Commission. The judgment later rendered against the Commission, after trial, is all that we have before us in the instant appeal.

The New Orleans Civil Service Commission, as a constitutional agency of the State of Louisiana, is vested with the responsibility of administering the civil service system in the City of New Orleans, La.Const. art. 10, Section 1. Appointments and promotions in the classified state and city service are made only after certification by the Civil Service Commission, La.Const. art. 10, Section 7.

Upon receiving her notice from the Police Pension Board for the City of New Orleans, Ms. Wallace realized that the Civil Service Commission was not honoring the specified January 22, 1973 effective date of her employment as a police officer. Instead of the 1973 date, the Civil Service records designated February 8, 1977 as the date of her employment as a police officer. The Pension Board told Ms. Wallace that it could not honor her judgment date if the Civil Service did not honor it. The approximate four year difference in dates is important in that eligibility for the sergeant's examination is based partially on time in service as a police officer.

Wallace pursued her original action under Title VII of the Civil Rights Act of 1964, 42 U.S.C., Section 2000e et seq., as well as 42 U.S.C., Section 1981 and 1983, against the Civil Service Commission. On April 25, 1979, the District Court dismissed the Section 1981 claim because it found no evidence of *racial* discrimination. On January 31, 1980, the District Court dismissed the 42 U.S.C., Section 2000e claim because the Civil Service Commission and its members were not "employers" within the meaning of the section. These orders were not appealed, and left surviving only the claim under 42 U.S.C., Section 1983, now before us.

*The Facts*

On July 20, 1970, Jeanne McGlory Wallace, a black female, began her employment with the New Orleans Police Department as a Communications Clerk. She asked about an application for policewoman and was told that the test for the classification "policewoman" was not open and that she would be notified whenever the test was open.

In 1972, Ms. Wallace had actual notice that the test for police officer was open to both males and females. However, when she went to the Civil Service Commission to apply for the test she was told that she was not tall enough as the height requirement for a police officer at that time was five feet eight inches (5'8"), whereas her height is five feet six inches (5'6"). She then asked for a written rejection, including the reason for it, and the signature of the person issuing the rejection. Instead, she was given the application and allowed to take the test. However, after taking the written examination, she took the physical examination which, obviously, she could not pass due to her height, and then filed charges of sex discrimination with the Equal Employment Opportunity Commission on September 25, 1972. She became party to a class action suit against the New Orleans Police Department but was severed from the class action on February 26, 1976, and took no further legal action until filing suit on May 16, 1977.

Ms. Wallace remained a Communications Clerk until May, 1974, when she became a Correctional Officer, having applied for and passed the Correctional Officer examina-

**2.** The 1973 settlement date was determined by the police department's review of Ms. Wallace's 1972 examination scores and the compu-

tation with other scores. Had Ms. Wallace been tall enough, she would have been hired on January 22, 1973.

tion. The positions of Communications Clerk and Correctional Officer both have lower rates of pay and fewer promotional opportunities than the position of police officer.

In January of 1976 the height requirement for a police officer's position was eliminated by the New Orleans Police Department and the Civil Service Commission. Ms. Wallace successfully passed the Civil Service examination in April, 1976, but failed the agility test. On February 8, 1977, she passed the agility test and was promoted to the position of police officer.

At the time of the trial against the Civil Service Commission, presently under review, Ms. Wallace had taken the sergeant's examination.[3] In determining an applicant's examination grade, certain credit is given for time served as a police officer.[4] The Commission contended that plaintiff was not entitled to credit for time served as a police officer during the period she was employed as a communications and as a correctional officer. Plaintiff argued that she was denied the opportunity to serve as a police officer during this period solely because of her height and that, consequently, she should be given credit for service as an officer during the period that the height regulation was in effect, even though she, in fact, had not actually served as such.

To erase the fact that she had not, in fact actually served as a police officer for three years and did not have the necessary "street experience", Ms. Wallace presented testimony of police officers who had received credit for time purportedly served as an officer although they were doing the same work she had done as a communications and as a correctional officer. Defendants introduced evidence that these officers were subject to call to active duty and, indeed, had worked the streets during Mardi Gras. There was testimony that some of the correctional officers had been called upon to do "street work" done by police officers.

Jack Belsom, the Director of the Civil Service Department for the City of New Orleans, testified that when employees of the New Orleans Police Department worked out of class, they were being temporarily assigned to other duties by their appointing authority. Such work did not change one's classification at all. The Commission had been urging the Superintendent of Police for years to take police officers out of the Communications Section and to staff it with civilians. In addition, Belsom testified that the announcement for taking the sergeant's examination does not mention street experience, simply years of experience in the *grade* of police officer.

Testimony from Mr. Belsom revealed that the minimum height requirement was retained in the early nineteen seventies after a survey showed that other police departments in the country were enforcing minimum height requirements. The Superintendent of Police in office at the time believed that a minimum height requirement would aid in obtaining personnel with a greater ability to subdue turbulent arrestees. There was also testimony that the taller officers would have less trouble firing guns over vehicles. Dean Marcel Garsuad, Chairman of the Civil Service, testified that the Commission viewed the height requirement as directed toward effective police work.

Conflicting testimony existed as to whether the New Orleans Police Department requested the five feet eight inches requirement or the Commission gave the Department the minimum height requirement. However, the Commission did have the discretion to accept or to reject the height requirement, regardless of reason.

The minimum height requirement was eliminated in 1975 on the recommendation of the Superintendent of Police and it was replaced with an agility test.

---

**3.** Ms. Wallace took the sergeant's examination in 1979 and passed with a rank of 206th out of 213. For the purpose of computing her time in service, the Civil Service used the date of February 8, 1977, that is two years and ten months, rather than the police department settlement date of January 23, 1973.

**4.** The sergeant's examination is graded on the basis of 70% merit and 30% seniority.

### The Applicable Law

The plaintiff pursued this case under the wrong theory and the District Court was accordingly led into applying the wrong standard when deciding it. The record shows that the plaintiff was under the impression that nothing more was required than disparate impact, and the District Court accepted that approach.

Whatever one might formerly have said, subsequent to the decision in *Griggs v. Duke Power Company*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), about the consequences spawned solely by disproportionate impact resulting from an apparently neutral rule, more light appeared in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

In *Davis*, rejected black applicants for the position of police officer filed suit against the District of Columbia, alleging a denial of equal protection. The Court of Appeals applied the *Griggs* standard and ruled in favor of the black applicants who contended that a verbal skill test given to all applicants disqualified a disproportionate number of blacks and bore no relationship to job performance. The Supreme Court reversed on the basis that the legal standards used for Title VII cases were not applicable to constitutional cases. Rather than a disproportionate impact theory, the standard to be used in equal protection was one of intent to discriminate, or discriminatory purpose.

Six months later the Supreme Court applied *Davis* in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The city planning commission's refusal to rezone was held not to be a violation of the Fourteenth Amendment since the Court found no discriminatory purpose or intent on the part of the city planning commission. However, the Court did say that "*Davis* does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purposes.... Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it 'bears more heavily on one race than another', *Washington v. Davis*, [426 U.S.] at 242, 96 S.Ct. at 2048—may provide an important starting point". 429 U.S. at 265–266, 97 S.Ct. at 563–564.

Finally, in *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), a state lifetime preference to veterans was held not to be unconstitutionally discriminatory against women. The Court defined the inquiry to be:

When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionably adverse, a twofold inquiry is thus appropriate. The first question is whether the statutory classification is indeed neutral in the sense that it is not gender-based. If the classification itself, covert or overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination. See *Arlington Heights v. Metropolitan Housing Dev. Corp., supra.* In this second inquiry, impact provides an 'important starting point', 429 U.S., at 266, [97 S.Ct. at 563] but purposeful discrimination is 'the condition that offends the Constitution'. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed. 554.

422 U.S. at 274, 99 S.Ct. at 2293.

 It is true that since *Monell v. New York City Department of Social Service*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the scope of Section 1983 liability has been extended to include local government bodies if they have officially adopted and promulgated arbitrary policies. However, in order to pierce the governmental entity's protection of qualified immunity, the plaintiff must show that the act, enforced pursuant to official policy, is so pervasive as to have the impact of custom and usage, 436 U.S. at 691–692, 98 S.Ct. at 2036. It is absolutely certain, however, that one

has a constitutional right to be free from discrimination on the basis of sex, *Califano v. Goldfarb*, 430 U.S. 199, 217, 97 S.Ct. 1021, 1032, 51 L.Ed.2d 270 (1977).

*Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786, *a Title VII case*, was not decided until June 27, 1977. A state statute requiring a minimum weight of 120 pounds and a minimum height of 5 feet 2 inches for prison guards was held to present a prima facie violation of Title VII because national statistics showed that this standard would exclude over 40% of the female population and less than 1% of the male population. However, under the circumstances prevailing in the state prison system, the Supreme Court held that the state had established a bonafide occupational qualification exception as to guards for maximum-security male penitentiaries.

In 1975, the Sixth Circuit decided *Smith v. Troyan*, 520 F.2d 492, *cert. denied* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976). There, police applicants were required to be at least 5 feet 5 inches in height. The validity of the height requirement was upheld, the Court saying:

> We think the district court erred in finding no 'rational support' for the height requirement. If East Cleveland's height requirement lacks 'rational support,' so do height requirements elsewhere. Plaintiff's own exhibits demonstrate that forty-seven of forty-nine state highway patrols and police forces and twenty-nine of twenty-nine municipal police departments surveyed have, or at least then had, height requirements (ranging from five feet, six inches to six feet). See Note, Height Standards in Police Employment & the Question of Sex Discrimination: the Availability of Two Defenses for a Neutral Employment Policy Found Discriminatory Under Title VII, 47 So.Calif.L.Rev. 585, 586–9 (1974) [hereinafter Height Standards]. That certain government entities, including the Wisconsin highway patrol, the Pennsylvania state police (2 CCH Empl.Prac.Guide ¶ 5177 [1973]) and the Law Enforcement Assistance Administration (33 Fed.Reg.

6415 [March 9, 1973]), no longer utilize or favor height requirements cannot rebut the nearly universal use of height requirements in hiring police. Such widespread use, of course, does not compel a finding of constitutionality, but 'is plainly worth considering' in determining the 'rationality' and constitutionality of height requirements. *Manning v. Rose*, 507 F.2d 889, 892 (6th Cir. 1974), quoting *Leland v. Oregon*, 343 U.S. 790, 798, 72 S.Ct. 1002, 1007, 96 L.Ed. 1302 (1952).

Moreover, at least three East Cleveland Police officials testified uncontradictedly and adamantly to the need for the height requirement. The chief of detectives, with twenty-six years' police experience, testified to the psychological advantage of a taller officer; a shift commander, with over seventeen years' experience, testified to the advantage of height in effecting arrests and emergency aid; and, the police chief testified similarly. Though plaintiff's expert witnesses discounted the importance of height and though the district court accepted that discounting, 363 F.Supp. at 1140–4, noteworthily, no expert had police experience.

In 1972, when the New Orleans police height regulation was in effect, and the Civil Service Commission declined to certify the plaintiff because she did not meet that standard, no federal court (as far as we can find) had ever held a police height regulation to be unconstitutionally discriminatory against women because of their sex. In January, 1976, eighteen months before the Supreme Court decided *Dothard*, the New Orleans police department and the Civil Service Commission eliminated the height requirement.

■ There was no testimony that the police department had adopted or enforced the height requirement for the purpose of discriminating against women because of their sex. On the other hand, there was undisputed testimony that in adopting the requirement (see page 1045, *ante*) the effective police work was the objective.

The District Court held that "... evidence of a disproportionate impact is rele-

vant to this question of intent since 'an invidious discriminatory purpose may often be inferred from the totality of the relevant facts' ". The Court further relied upon the *Blake v. City of Los Angeles* decision, 595 F.2d 1367 (9th Cir., 1979), that a minimum height requirement for police officers was a violation of Title VII. Once again, it must be pointed out that the Title VII standard of disparate impact will not satisfy the necessity under Section 1983 of proving an intent or purpose to discriminate for impermissible reasons. The evidence on behalf of Ms. Wallace failed to meet this requirement. Therefore, the District Court should have dismissed the complaint.

The judgment of the District Court is REVERSED.