**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**LULAC, GI Forum and NAACP,**
**Plaintiffs-Intervenors-Appellees,**

v.

**STATE OF TEXAS, et al.,**
**Defendants-Appellants.**

No. 85–2579.

United States Court of Appeals,
Fifth Circuit.

July 2, 1986.

As Clarified Sept. 12, 1986.

Kevin T. O'Hanlon, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for State of Texas.

Brian K. Landsberg, Chief, Appellate Section, Civ. Rights Div., Michael Carvin, Washington, D.C., Bob Wortham, U.S. Atty., Steven M. Mason, Asst. U.S. Atty., Tyler, Tex., Jeremiah Glassman, Irving Gornstein, Educ. Opp. Civ. Rights Div., for U.S.

Bruce M. Berman, Howard P. Willens, Washington, D.C., for amicus curiae Educational Testing Service.

Roger Rice, Camilo Perez-Bustillo, Jose Roberto Juarez, Jr., Cambridge, Mass., for GI Forum and NAACP.

Albert Kauffman, San Antonio, Tex., for LULAC, GI Forum, et al.

Audrey Little, Asst. Gen. Counsel, NAACP, Brooklyn, N.Y., for Leslie Duggan, Jr., et al.

Michael Slutsky, Richard F. Watt, Cotton, Watt, Jones & King, Chicago, Ill., for amicus curiae Texas Civil Liberties Union.

Before THORNBERRY, RUBIN and JOLLY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

This action challenges the Texas requirement that college students pass a Pre-Professional Skills Test (PPST) before scheduling more than six hours of professional education courses at any state college or university. To teach in Texas public schools, a teacher must have a certificate from the Texas State Board of Education, which requires either an undergraduate minor in education, based on eighteen hours of courses in professional education, or a major in education, based on thirty hours. A college student who wishes to become a teacher could not do so without first passing the PPST and then passing the professional education courses.

Intervenors representing two sets of minority groups, one composed of elementary and secondary school students and the other of college students who desire to take education courses, challenge this requirement because the passing rate for minority-group students who take the PPST is, on average, much lower than the passing rate for white students. They assert that this discrepancy impedes minority students from becoming teachers in violation of their constitutional and statutory rights, and will prevent the Texas school system from hiring a sufficient number of minority teachers to fulfill its obligation under a court desegregation order.

The district court, 628 F.Supp. 304, issued a preliminary injunction requiring the Texas Education Agency to permit students to enroll in education courses who would have been qualified to do so but for their having failed the PPST. The district court did not determine, however, whether or not the test is a valid measure of the basic skills essential to perform satisfactorily in teacher-education courses. A state is not obligated to educate or certify teachers who cannot pass a fair and valid test of basic skills necessary for professional training, and the record contains considerable evidence tending to show that the PPST is a valid measurement of such skills. Without assessing this evidence, the district court had no adequate basis to decide the requisites for issuance of a preliminary injunction. The extent of the harm to the parties, whether that harm is irreparable, the likelihood of success on the merits by demonstrating discriminatory intent, and the effect of the injunction on the public interest all turn on whether the test is a fair measure of necessary skills. Accordingly, we vacate the preliminary injunction.

## I.

The PPST requirement is part of a Texas program to improve the quality of education in the State. It was adopted after five years of effort by Texas state agencies to raise the level of competency of the State's teachers. In 1979, the Governor of Texas established an Advisory Committee on Education. The Committee recommended that the State Board of Education test the basic skills of all candidates for teacher certification. At the same time, the Texas legislature created a Commission on Standards for the Teaching Profession. Acting on the Commission's recommendations, the Texas legislature in 1981 adopted a law directing the Board to require satisfactory performance in an examination of basic skills as a condition to admission into any approved teacher-education program. Contemporaneously, the legislature directed the Board to require each teacher already certified to pass an examination de-

signed to test the teacher's knowledge of the subjects taught, as a condition of continued certification. After giving some consideration to other tests and to the possibility of the State developing its own examination, the Board decided in 1982 that the PPST test of basic reading, writing, and arithmetic skills should be used, if it could be validated for the statutory purpose.

The PPST is designed to test basic skills at the twelfth grade level. It was developed by Educational Testing Service (ETS), a corporation established in 1947 by three major educational organizations, the American Council on Education, the College Entrance Examination Board, and the Carnegie Foundation for the Advancement of Teaching. ETS provides educational tests to be used at the preschool, elementary, secondary, college, and graduate levels, as well as a number of licensing, certification, and employment examinations. It developed, and currently administers, the National Teacher Examinations, a battery of standardized tests used in twenty-five states to measure the academic preparation of college seniors and graduates who have completed programs in teacher education.

The State Board solicited detailed proposals from several firms for validation studies before contracting with IOX Associates, a firm that specializes in performing such studies, to determine whether the PPST was valid, and to establish passing test scores.

IOX issued a lengthy validation report based on the assessments of 624 Texas public school and university teachers. These educators were asked to examine the test, both overall and question by question, to decide whether students in Texas college preparatory programs were ordinarily taught what the test required them to know, and whether teachers would need to know the tested material in order to perform successfully in teacher education courses and as teachers. More than 95% of the educators reported that students in the Texas school system were taught "most or almost all" the information needed to answer all of the questions on the test. An equal percentage reported that "most of almost all" of the questions on the test required information relevant to successful performance as a teacher. On a question by question basis, 88% reported that the reading, writing and essay portions were relevant to success as a teacher, and 78% reported that the mathematics portion was relevant. More than 75% found the test relevant to the professional education courses for which it determined eligibility. The report concluded that, in the opinion of IOX, the PPST met the requirements of validation for relevance to the teacher education program and to performance as a classroom teacher. To counter the test-validation testimony of the Board's witnesses, the intervenors offered expert testimony that the test is biased against minority-group students and is not a valid test of either success in education courses or in classroom teaching.

The Board, in February 1984, formally approved the use of the test and established the scores that would be necessary to pass. The PPST has also been chosen by four other states—Arizona, Kansas, Tennessee, and Delaware—either as a prerequisite to enrollment in college-level professional education courses or as a prerequisite to teacher certification.

Before the Board adopted the test, it learned that, based on experimental testing, white students would pass in a much larger proportion than Black and Hispanic students. The test was first administered in March 1984. Since then it has been given three times every year, and students are permitted to take it as many times as they wish. The prediction was correct: 73% of the Anglo-Whites, 34% of the Hispanics, and 23% of the Blacks who have taken the test passed it. The passing rates of Black and Hispanic students improved significantly the second year the test was given, while the rate for white students remained about the same. The failure rate for both Black and Hispanic students, however, remains much higher than that for white students. Three times as many

Blacks and more than twice as many Hispanics have failed the test as have Whites.

Minority enrollment in the public schools is expected to reach fifty percent during the next few years. At present, Hispanic students constitute 29% and Blacks 15% of total state enrollment, while only 12% of the teachers are Hispanic and 11% are Black. Thus, at present, these minority groups provide 44% of the students but only 23% of the teachers. A test that reduces the entry of minority-group teachers would adversely affect that ratio.

## II.

This suit was instituted by the United States to desegregate Texas public elementary and secondary schools long before adoption of the PPST. After lengthy proceedings, a desegregation order was issued in 1971.[1] Although the United States was the original plaintiff, it now joins with the State of Texas in defending the PPST requirement. The challenge comes instead from two groups of intervenors: (1) organizations appearing as representatives of Hispanic and Black children who attend public elementary and secondary schools and who contend that the PPST requirement violates the terms of the 1971 desegregation decree, and (2) the same organizations appearing as representatives of minority-group college students who wish to become teachers and, on the same basis, fourteen individual students at Texas colleges and universities who were denied enrollment in professional education courses solely because of their PPST scores. These individuals, and the organizations that represent them, contend that the testing requirement violates their constitution-al rights to equal protection, their statutory rights under Title VI and the Equal Educational Opportunity Act, and their rights under a contract between the United States and the State of Texas, called the Texas Higher Education Plan. The intervenors stress that they, too, are in favor of teacher competency and of raising standards; they object only to the method chosen by the Board.

The district court found a likelihood that the intervenors would prevail on the merits by demonstrating that discriminatory intent and not simply concern for teacher competency played a part in the Board's decision to adopt the PPST. In so finding, the district judge relied upon evidence in the record that the Board had been advised, before adopting the test, that a much greater percentage of minority-group than of majority-group students would fail the test, upon evidence of historical discrimination against minority-group students in Texas elementary and secondary schools, upon the Board's failure to offer remediation courses to minority-group students, its failure to take other affirmative action to reduce the test's anticipated discriminatory impact, and the Board's adoption of an alternative certification procedure to meet the State's immediate need for teachers, which permits fewer education courses but nevertheless requires a passing score on the PPST.

The intervenors point out that, unlike bar examinations which are used to measure knowledge and skills required in the practice of a profession, the PPST is used to determine whether a person may even be admitted to pre-professional training. They contend that the test does not provide

1. *United States v. State of Texas*, 321 F.Supp. 1043 (E.D.Tex.1970), *and United States v. State of Texas*, 330 F.Supp. 235 (E.D.Tex.1971), *modified & aff'd*, 447 F.2d 441 (5th Cir.1971), *stay denied sub nom. United States v. Edgar*, 404 U.S. 1206, 92 S.Ct. 8, 30 L.Ed.2d 10 (1971), *cert. denied*, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972); *United States v. State of Texas*, 342 F.Supp. 24 (E.D.Tex.1971), *aff'd*, 466 F.2d 518 (5th Cir.1972), *vacated in part after remand*, 509 F.2d 192 (5th Cir.1973); *United States v. State of Texas*, 356 F.Supp. 469 (E.D.Tex.1972), *aff'd*, 495 F.2d 1250 (5th Cir.1974); *United States v. State of Texas*, 506 F.Supp. 405 (E.D.Tex.1981), *and United States v. State of Texas*, 523 F.Supp. 703 (E.D.Texas 1981), *rev'd*, 680 F.2d 356 (5th Cir. 1982); *United States v. Texas*, 498 F.Supp. 1356 (E.D.Tex.1980), *rev'd sub nom Gregory-Portland Independent School District v. Texas Education Agency*, 576 F.2d 81 (5th Cir.1978), *cert. denied*, 440 U.S. 946, 99 S.Ct. 1423, 59 L.Ed.2d 634 (1979); *United States v. Gregory-Portland Independent School District*, 654 F.2d 989 (5th Cir. 1981).

a measure of the skills actually used by teachers, and that it is arbitrary to use the test as the sole criterion for admission to professional education programs, to the exclusion of general academic performance and other employment-related qualifications. They note that some of the individual intervenors have excellent grades and have failed the PPST by only a few points. They assert that the Board makes no re-examination of test results, does not take academic credentials into account, and has not attempted to correlate successful performance as a teacher with test scores.

### III.

A preliminary injunction may issue only if the applicant demonstrates: (1) a substantial likelihood of prevailing upon the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) potential harm if the injunction is denied that exceeds the potential damage to the opposing party if the injunction is issued; and (4) a finding that the injunction is not contrary to the public interest.[2] A district court's grant or denial of an injunction is subject to review only for abuse of discretion.[3] The four determinations that support injunctive relief are mixed questions of fact and law:[4] subsidiary findings of fact, such as a finding of discriminatory intent, must be upheld unless clearly erroneous,[5] while conclusions of law, and the ultimate resolution of these four determinations by application of the law to the findings of fact, are freely reviewable.[6]

Applying these standards, we turn first to the contention that the Board's actions violate the terms of the 1971 desegregation order. That order directed Texas state education agencies to undertake affirmative action to obliterate all remaining vestiges of the former de-jure dual-school system, to prevent their recurrence, and to make the necessary progress to achieve racially integrated schools, including fully integrated facilities and staff. Following modification and approval by this court[7] the order required equitable and procedural safeguards in the hiring, assignment, promotion and dismissal of minority teachers. The order included a provision forbidding the State or its agencies to "permit, make arrangement for, acquiesce in or give support of any kind to the hiring ... or treatment of faculty and staff members who work directly with children in a discriminatory manner on account of race, color, or national origin."[8] It also imposed a duty on the State to use only "objective, non-racial and non-ethnic criteria" in hiring faculty.[9]

■ The intervenors urge that the anticipated reduction in enrollment of minority students in professional education courses occasioned by the PPST requirement would so drastically reduce the number of teachers belonging to these minority groups as to violate the 1971 order. That order, however, was issued in a suit which concerned the elimination of segregation only in the State's primary and secondary schools. Therefore, only those intervenors that represent Hispanic and Black elementary and secondary school students, GI Forum, LULAC, and the NAACP, have standing to challenge violations of the 1971 order.

---

**2.** *Gearhart Industries v. Smith International, Inc.,* 741 F.2d 707, 710–11 (5th Cir.1984); *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984).

**3.** *Gearhart, supra; Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir.,1985).

**4.** *Gearhart, supra.*

**5.** *See Hunter v. Underwood,* — U.S. —, — 105 S.Ct. 1916, 1921, 85 L.Ed.2d 222 (1985); *Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

**6.** *See Washington v. Watkins,* 655 F.2d 1346, 1352–4 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982); 9 C. Wright & A. Miller § 2589 at 753 (1971 & Supp. 1985).

**7.** *See United States v. Texas,* 447 F.2d 441 (5th Cir.1971).

**8.** *Id.* at 446 ¶ E(1).

**9.** *Id.* at 446 ¶ E(2).

The claim of these intervenors is independent of the claim brought by the college-student intervenors. If the State has violated the 1971 order by using the PPST requirement as a means of discrimination in hiring teachers, its action is proscribed, and the district court had the power to enjoin the PPST requirement, whether or not the test violated the constitutional or federal statutory rights of college students who seek to become teachers.

The PPST does not violate any explicit provision of the 1971 order. The district court found, however, that less than 1,000 of the 3,000 minority-group students who have taken the PPST have been able to continue in their professional education courses. The court concluded that, by reducing the supply of certified minority-group teachers, the test would "thwart the purpose" of the staff integration provisions of the 1971 order and violate the State's "duty to offer all students an integrated faculty." Use of the test would impair "the rights of students to equal education in a unitary school system, by disproportionately allocating the burden of the teacher shortage on school districts with a heavy minority population and also by depriving students of a truly integrated group of teachers."

If, indeed, the State intentionally took action with this purpose, and the action was shown to be likely to reduce substantially the number of qualified teachers, a violation of the 1971 order might be found. The findings of fact based on the evidence presented of record, however, simply do not justify such a conclusion. The test has been in use for only a brief period. Unsuccessful applicants are permitted to retake the test, and the passing rate for minority-group students has been increasing. The ultimate impact of the PPST on the number of minority teachers in the State has not been assessed.

■ More important, there is substantial evidence that the test does determine whether or not education-course applicants have the knowledge of basic skills that is essential both to success in passing pre-certification education courses and to proficiency in teaching. The 1971 order does not require the State to provide minority-group students with teachers who are not competent. The State's duty to integrate its schools and to take affirmative action to eliminate the vestiges of past discrimination would indeed be violated were it to thrust upon minority students, both as role models and as pedagogues, teachers whose basic knowledge and skills were inferior to those required of majority-race teachers.

■ The district court did not discredit the test-validation evidence, but stated only that the evidence was insufficient to determine whether or not the PPST had been adequately validated. In the light of substantial evidence in the record showing that the test was valid, the court erred by failing to assess the import of this evidence, and, in the absence of such an assessment, was clearly erroneous in finding that the State's action violated the 1971 order. Issuance of the injunction on the ground that the PPST violated the 1971 order was, therefore, an abuse of discretion.

### IV.

LULAC and GI Forum also assert a separate interest on behalf of "their members or children of members who attend or wish to attend colleges and who are being denied rights to pursue their education in the State of Texas." The Texas State Chapter of the National Association for the Advancement of Colored People similarly alleges its representation of each of these separate groups. The fourteen individual intervenors each allege solely that they are college students who intend to be school teachers and have been unable to pass the PPST. The appellants object, on procedural and jurisdictional grounds, to consideration of these claims as ancillary to the 1971 order, rather than in a separately filed lawsuit.

LULAC, GI Forum, and the NAACP were already parties to this lawsuit, having intervened in 1972. They therefore had standing to assert their objections to the

PPST as it affected the 1971 court desegregation order. In asserting a separate challenge to the PPST as representatives of college students, however, these organizations, in effect, sought to join additional claims. They did not request, and the court did not expressly permit, this joinder under Federal Rule of Civil Procedure 18(a). The court implicitly permitted it, however, by granting the motion for a preliminary injunction partly on the basis of these new grounds. Because the appellants do not invoke the Federal Rules of Civil Procedure to object to the joinder of these new claims, we do not rule on whether joinder was properly within the court's discretion.

■ The court also permitted the fourteen college students to intervene as of right under Rule 24(a), reasoning that a determination of the constitutionality of the PPST would substantially affect their rights. Although the outcome of this suit might benefit these students, their claims do not satisfy the prerequisites for intervention as of right set by Federal Rule of Civil Procedure 24.[10] The intervenors do not contend that they have a federal statutory right to intervene. They have not alleged that, if the joinder of their claims is proper, the representative organizations already parties to this suit would not adequately protect their interests,[11] or that disposition of the request for an injunction would "as a practical matter, impair or impede" their ability to bring a separate action to protect any of their rights that the PPST requirement might violate.

Although the court erred in granting intervention as of right, it might have granted permissive intervention under Rule 24(b) because the intervenors raise common questions of law and fact regarding the validity of the PPST.[12] Appellants did not oppose the college students' intervention below, and do not now object to the district court's reliance on Rule 24(a) rather than 24(b). Moreover, this error does not substantially affect the rights of any parties.

■ Instead of attacking the correctness of this intervention under Rule 24, appellants assert only that the district court lacked "ancillary jurisdiction" and that the suit should be dismissed. They concede correctly, however, that the district court had both subject matter and personal jurisdiction over the intervenors' claims. The appellants' real objection is that, by permitting those claims that do not relate to the 1971 desegregation order to be filed as an intervention rather than as a separate suit, the intervenors' claims come before Judge Wayne Justice, the same judge who had decided the earlier case in the intervenors' favor.

Joinder of these two separate claims was, at worst, a procedural irregularity. If the intervenors are required to file a new suit asserting the college students' claims, it might, by the normal allotment process followed in the Eastern District of Texas, be allotted to Judge Justice once again. If the case were allotted to another judge, it, like the school desegregation case, would present as a crucial issue the validity of the PPST test. Judge Justice has already heard the evidence on the motion for preliminary injunction and has assigned the case for trial on the merits at an early date. At this stage of the proceedings, trial of the same issue before a different judge would be wasteful and inefficient, and might delay a decision on the merits in this case of immediate concern not only to the litigants, but to the entire state.

Our decision is not to be viewed as sanction for this type of intervention which, by

**10.** *See New Orleans Public Services, Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452, 463 (5th Cir.), *cert. denied, sub nom. Morial v. United Gas Pipe Line Co.,* — U.S. —, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984).

**11.** *See Bush v. Viterna,* 740 F.2d 350, 355–57 (5th Cir.1984); *Davis v. East Baton Rouge Parish Sch. Bd.,* 721 F.2d 1425, 1441 (5th Cir.1983);

*Hines v. Rapides Parish Sch. Bd.,* 479 F.2d 762 (5th Cir.1973).

**12.** *Cf. McKay v. Heyison,* 614 F.2d 899, 906 (3d Cir.1980); *Finch v. Mississippi St. Med. Ass'n, Inc.,* 585 F.2d 765, 780 (5th Cir.1978), *modified on other grounds,* 594 F.2d 163 (5th Cir.1979).

resting on a slender legal reed, enables a litigant to select the cause in which, and the judge to whom, it will present its case. The primary focus of the 1971 school desegregation order is on primary and secondary schools. It is at least open to question whether this fifteen-year-old litigation should have been expanded to encompass the separate and distinct claims of college students who desire to become teachers.

Whatever the propriety of the joinder and intervention, an issue on which we have not ruled, we refuse to dismiss the suit, partly because the appellants have not brought any challenge on the procedural grounds afforded by Rule 18 and 24, and primarily because of the statutory mandate that we may not reverse for "errors or defects which do not affect the substantial rights of the parties."[13]

■ At this stage of the proceedings, we are unable to find prejudice to the appellants. Their principal assertion of prejudice is that the grant of intervention caused them to appear before Judge Justice, rather than a randomly selected judge. But even assuming that a random selection process would have been followed in the Eastern District if the intervenors had filed a separate suit, a matter about which the appellants offer no evidence or authority, the appellants have not shown that Judge Justice was biased against them or had a direct personal interest in the case. Although parties certainly have a right to have their case heard by a neutral and impartial judge,[14] they have no greater right to avoid appearing before a particular judge than they have to select one.

■ The appellants also assert that venue would have been improper in the Eastern District if this action had been filed as a separate suit. They reason as follows: an action by private plaintiffs could not have proceeded against the State of Texas or its agencies, because of the Eleventh Amendment; rather, it could have been brought only against the Commissioner of Education under the doctrine of *Ex parte Young.*[15] Because the Commissioner resides in the Western District of Texas, venue in this federal question case would be improper under 28 U.S.C. § 1391(b) (1982). The appellants offer us no evidence, however, that the Commissioner of Education resides solely in the Western District[16] and we have noted that they say nothing at all about where the claim in this case arose, a second basis for venue under § 1391(b). Thus, the appellants have not shown that venue was improper and certainly have not shown that their inability to raise this objection in the context of a separate private suit was prejudicial.

We, therefore, hold that the district court had jurisdiction over all of the claims asserted. The appellants having sought on this basis no relief other than dismissal of the suit, we deny that request.

## V.

The college-student intervenors contend that the State, in requiring that they pass the PPST, has denied them their constitutional right to equal protection of the law. As we have noted, the district court found a likelihood that they would prevail on the merits of their claim, inferring discriminatory intent from the State Board's knowledge that a much greater percentage of

13. 28 U.S.C. § 2111 (1982); Fed.R.Civ.P. 61. *See Palmer v. Hoffman,* 318 U.S. 109, 116, 63 S.Ct. 477, 481, 87 L.Ed. 645 (1943); *United States v. Vahlco Corp.,* 720 F.2d 885, 890 n. 6 (5th Cir.1983); *Flores v. Cabot Corp.,* 604 F.2d 385, 386 (5th Cir.1979), *cert. denied,* 445 U.S. 916, 100 S.Ct. 1276, 63 L.Ed.2d 600 (1980).

14. *See Aetna Life Insurance Co. v. Lavoie,* —— U.S. ——, —— ——, 106 S.Ct. 1580, 1585–1587, 89 L.Ed.2d 823 (1986).

15. 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

16. *Cf. Florida Nursing Home Ass'n v. Page,* 616 F.2d 1355, 1360 (5th Cir.) (noting that state agency or agency head can have more than one residence for venue purposes), *cert. denied,* 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980), *rev'd on other grounds sub nom. Florida Dept. of Health & Rehabilitative Servs. v. Florida Nursing Home Ass'n,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981).

minority than of white students would be adversely affected, the history of racial discrimination in the Texas schools, the racial composition of the Board, and the legislative history of its decision. Such circumstantial evidence was properly considered, indeed, its use was mandated by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.:*

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of official action—whether it "bears more heavily on one race than another" ... may provide an important starting point....
> The historical background of the decision is one evidentiary source.... The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purpose....
> The legislative or administrative history may be highly relevant....
> The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether rationally discriminatory intent existed.[17]

There was, therefore, no error in the district court's reliance on these indicia of discriminatory intent.

■■■ The court erred, however, in failing to determine whether the test require-

ment served its stated nondiscriminatory purpose. An action does not violate the equal protection clause simply because the decisionmaker knows that it will have a disparate impact on racial or ethnic groups, as long as "permissible racially neutral selection criteria and procedures have produced the monochromatic result."[18] The Constitution forbids only purposeful discrimination.[19] The fourteenth amendment is violated only if a state decisionmaker selectes or continues in a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.[20] In assessing the motivation of the decisionmaker, it is essential to determine the genuineness of the state interests asserted, their nature and strength, and the degree to which they are served by the challenged action.[21] Without evaluating these factors, a court cannot adequately predict a likelihood of success on the merits.

■■■ As the Supreme Court described in *Personnel Administrator v. Feeney,* "[T]he Fourteenth Amendment guarantees equal laws, not equal results."[22] Although *Feeney* involved sex, rather than race discrimination, the Court has repeatedly held that disproportionate impact of state action on different racial ethnic groups does not of itself violate the Constitution.[23] The plaintiff must prove that discriminatory purpose was a "motivating factor" in the

---

**17.** 429 U.S. 252, 264–68, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977) (citations omitted); *Washington v. Davis,* 426 U.S. 229, 240–42, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976); *see also Batson v. Kentucky,* — U.S. —, —, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986).

**18.** *Alexander v. Louisiana,* 405 U.S. 625, 634, 92 S.Ct. 1221, 1227, 31 L.Ed.2d 536 (1972).

**19.** *Washington v. Davis,* 426 U.S. at 238–48, 96 S.Ct. at 2046–52; *Arlington Heights,* 429 U.S. at 264–68, 97 S.Ct. at 562–65; *United States v. State of South Carolina,* 445 F.Supp. 1094, 1100–1104 (D.S.C.1977), *aff'd mem.,* 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978).

**20.** *Personnel Administrator v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979).

**21.** *United States v. Texas Education Agency,* 564 F.2d 162, 168 (5th Cir.1977), *cert. denied sub nom. Austin Independent School District v. United States,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979); *Debra P. v. Turlington,* 644 F.2d 397, 407 (5th Cir.1981); *United States v. State of South Carolina,* 445 F.Supp. 1094, 1100–04 (D.S. C.1977), *aff'd mem.,* 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 975 (1978).

**22.** 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979).

**23.** *See Washington v. Davis,* 426 U.S. at 238–48, 96 S.Ct. at 2046–52; *see, e.g., Wallace v. City of New Orleans,* 654 F.2d 1042 (5th Cir.1981); *Tyler v. Vickery,* 517 F.2d 1089, 1101–2 (5th Cir. 1975), *cert denied,* 426 U.S. 940, 96 S.Ct. 2260, 49 L.Ed.2d 393 (1976).

decision.[24] The decisionmaker's knowledge that an action will have an adverse impact on a racial, ethnic, or other group is but one item of circumstantial evidence. The court must examine "the totality of the relevant facts" before deciding whether the decision was impermissibly motivated.[25] As the district court recognized, and the intervenors agree, the State has an interest in ensuring teacher competency. This is a goal of unquestioned legitimacy and importance. In order to assess the constitutionality of the PPST requirement, therefore, it was necessary that the district court consider and evaluate all of the evidence bearing on the relationship between the requirement and the State's important educational interests. This the court failed to do.

In deciding whether the State acted with discriminatory intent the court must take into account the validity of the test as a measure of adequate preparation for teacher education. It need not also consider correlation with competency on the job. As the Supreme Court stated in *Washington v. Davis*,[26] the validity of a test that is required for entry into a training program rather than into the work force is to be measured only against the demands of the training program. In any event, whether the test is valid or invalid to measure the competency it was designed to test strongly influences the determination of the State's purpose in requiring it.[27] Absent a determination on this crucial matter by the district court, it erred in finding, as a mixed question of fact and law, that there was a substantial likelihood that the intervenors would succeed on the merits. Without this finding, there was no warrant to issue a preliminary injunction on the basis that the PPST requirement denied the students equal protection.

Whether the test is valid is also a threshold factual inquiry for deciding all of the other issues prerequisite to issuance of a preliminary injunction. If the test measures only the knowledge and skills a student must have before taking education courses, there is no irreparable injury, in the legal sense, as a result of requiring each student to pass the test. The student's entrance into education courses is merely delayed until he has acquired the necessary prerequisite skills, and the district court would have been clearly erroneous in holding otherwise. If the test is valid, the State suffers harm from being required to educate and, perhaps, certify teaching candidates who lack basic and necessary skills. The public interest in teacher competence cannot be gainsaid, and whether the test measures competence determines whether the public interest is served by requiring it.

We intimate no opinion at this time concerning whether the evidence on the merits will be sufficient to warrant the conclusion that, even if the test is not shown to be valid, Texas has violated either the 1971 order or the equal protection clause.

## VI.

The intervenors assert that the Board's adoption of the PPST denies them both procedural and substantive due process. The due process clause does not protect against all injury by state action, but only against those actions that "deprive" a person of "life, liberty, or property."

As a matter of substantive due process, as the intervenors correctly assert, an individual has a liberty right to engage in a chosen profession free from unreasonable governmental interference.[28] The

---

24. *Batson v. Kentucky,* —— U.S. ——, ——, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986); *Washington v. Davis,* 426 U.S. at 238–48, 96 S.Ct. at 2046–52; *Arlington Heights,* 429 U.S. at 264–68, 97 S.Ct. at 562–65; *Personnel Administrator v. Feeney,* 442 U.S. at 273–80, 99 S.Ct. at 2293–96; *Rogers v. Lodge,* 458 U.S. 613, 617–22, 102 S.Ct. 3272, 3275–78, 73 L.Ed.2d 1012 (1982); *cf. City of Mobile v. Bolden,* 446 U.S. 55, 66–74, 100 S.Ct. 1490, 1499–1503, 64 L.Ed.2d 47 (1980) (plurality opinion).

25. *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. at 2048–49; *United States v. Texas Education Agency,* 564 F.2d 162 (5th Cir.1977), *cert. denied sub nom. Austin Ind. Sch. Dist. v. United States,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979).

26. 426 U.S. 229, 248–252, 96 S.Ct. 2040, 2052–53, 48 L.Ed.2d 597 (1976).

27. *Cf. Tyler v. Vickery,* 517 F.2d 1089 (5th Cir. 1975), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2260, 49 L.Ed.2d 393 (1976); *Armstead v. Starkville Municipal Separate School District,* 461 F.2d 276 (5th Cir.1972).

28. *See, e.g., Phillips v. Vandygriff,* 711 F.2d 1217, 1222 (5th Cir.1983), *reh'd,* 724 F.2d 490 (5th Cir.1984); *Board of Regents v. Roth,* 408 U.S. 564, 573–74, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923); *Ferrell v. Dallas Independent School District,* 392 F.2d 697, 707 (5th Cir.

very statement of this principle implies the corollary that reasonable governmental examination is permitted, whether as prerequisite to entrance to college, to a professional school, or to a profession.[29] If the test is valid, requiring a student to pass it would not be demonstrably unreasonable.

■ The district court also found that the State had denied the students procedural due process by giving them little notice of, and no materials on, the nature of the test, other than a pamphlet. While an individual is entitled to notice and a hearing before state action deprives him of life, liberty, or property, no such right attends legislative enactments that affect a general class of persons. When the legislature enacts a law, or a state agency adopts a regulation, that affects a general class of persons, all of those persons have received procedural due process by the legislative process itself and they have no right to individual attention. The challenges to such laws and regulations must be based on their substantive compatibility with constitutional guarantees.[30] In finding a lack of procedural due process in the Board's actions, the court erred as a matter of law.

■ The intervenors therefore have not shown a likelihood that they will prevail on their claim that the manner in which the State imposed the PPST requirement violated their substantive or procedural rights under the due process clause.

## VII.

The district court also determined that the college students were likely to succeed on their claims that the PPST requirement violated Title VI of the Civil Rights Act of 1964,[31] which prohibits discrimination in federally assisted programs, and under the Equal Educational Opportunity Act of 1974[32] which forbids "discrimination by an educational agency on the basis of race ... in the employment ... of faculty or staff ..."[33]

In view of the Supreme Court's holding that proof of discriminatory intent is not required in a Title VI action for equitable relief,[34] this Court has recently concluded that the Title-VII-disparate-impact standard should be applied to Title VI claims for equitable relief in cases in which "an employer has instituted a specific procedure, usually a selection criteria for employment, that can be shown to have a causal connection to a class imbalance in the work force."[35] Intervenors, therefore, may be able to establish their Title VI claim under either a disparate-treatment theory, by proving discriminatory intent, or under a disparate-impact theory, by proving that a facially neutral employment practice has the result of producing a significantly adverse impact on one or more racial groups.[36]

■ Having ruled that intentional discrimination had been sufficiently established to issue a preliminary injunction, the district court did not consider intervenor's assertion that a Title VI violation was likely to be proved on the basis of disparate impact. The establishment of disparate impact, however, does not alone suffice to prove a violation of either Title VII or Title VI. Title VII does not invalidate a test that has disparate impact if the test is

---

1968); *Shaw v. Hospital Authority,* 507 F.2d 625, 628 (5th Cir.1975); *Daly v. Sprague,* 675 F.2d 716, 727 (5th Cir.1982); *see also Regents of the University of Michigan v. Ewing,* — U.S. —, —, & n. 7, 106 S.Ct. 507, 512 & n. 7, 88 L.Ed.2d 523 (1986).

**29.** *See, e.g., Washington v. Davis,* 426 U.S. at 245–48, 96 S.Ct. at 2050–52; *Schware v. Board of Bar Examiners,* 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957); *Debra P. v. Turlington,* 730 F.2d 1405 (11th Cir.1984); *Goforth v. Poythress,* 638 F.2d 27, 30 (5th Cir.1981); *Tyler v. Vickery,* 517 F.2d 1089 (5th Cir.1975), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2260, 49 L.Ed.2d 393 (1976); *United States v. State of Carolina,* 445 F.Supp. 1094 (D.S.C.1977), *aff'd mem.,* 434 U.S. 1026, 98 S.Ct. 756, 65 L.Ed.2d 775 (1978); *cf. Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976).

**30.** *Nolan v. Ramsey,* 597 F.2d 577, 580 (5th Cir.1979); J. Nowak, A Rotunda, J. Young, Constitutional Law 556 (2d ed. 1983).

**31.** 42 U.S.C. § 2000d.

**32.** 20 U.S.C. § 1701 et seq.

**33.** 20 U.S.C. § 1703(d).

**34.** *Guardians Association v. Civil Service Commission,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983).

**35.** *Castaneda by Castaneda v. Pickard,* 781 F.2d 456, 465 n. 11 (5th Cir.1986); *see also NAACP v. Medical Center, Inc.,* 657 F.2d 1322, 1330–31 (3d Cir.1981) (en banc).

**36.** *See, e.g., Page v. U.S. Industries, Inc.,* 726 F.2d 1038, 1045 (5th Cir.1984).

reasonably calculated to measure a bona fide occupational qualification.[37] Similarly, discrimination in violation of Title VI can be proved through disparate impact analyses only if the challenged test is not a reasonable measure of a bona fide educational requirement.[38]

■ For the same reasons that we have held the record inadequate to warrant a preliminary injunction on the basis of the fourteenth amendment claim without determining the validity of the PPST, we find it inadequate to support the injunction for violation of Title VI. Sufficient evidence has been presented by the State indicating that the PPST test is a valid measure of a bona fide occupational qualification to warrant its assessment in the district court's determination of whether to issue an injunction. In failing to do so, the district court abused its discretion.

■ The contention that the Board has violated the Equal Educational Opportunity Act is without merit. The EEOA does not impose any obligation upon state higher education systems or authorities. The Act is limited in effect to the activities of state and local educational agencies at the elementary and secondary levels.[39] In administering its higher education systems, even a state that formerly practiced de jure segregation is not required by the Act to suspend or lower valid academic standards to accommodate high school students who may be ill-prepared because of prior constitutional violations by its local and elementary school systems. Such a remedial measure would go far beyond correction of the "nature and extent of the violation,"[40] and would do nothing to remedy the basic constitutional vice.

■ We do not here attempt to delineate the scope of remedial measures that may be taken to eliminate segregation or intimate that the remedy for desegregation is limited to elimination of the unconstitutional practice. Remedial measures, however, should generally be limited to the school system that was unconstitutionally conducted and should not extent to imposing affirmative obligations on other state agencies.[41] If the PPST is valid, enjoining its use would not, in any meaningful way, counteract the effects of past segregation, but might simply serve to perpetuate a dual standard.

Finally, the district court did not reach the intervenors' claim that the PPST requirement violated their contractual rights as third-party beneficiaries of the Texas Higher Education Plan, and we do not undertake initial analysis of that claim on appeal.

For these reasons, we REVERSE the district court's order issuing a preliminary injunction. The case shall proceed to trial on the merits.

37. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971); *Dothard v. Rawlinson*, 433 U.S. 321, 328–29, 97 S.Ct. 2720, 2726–27, 53 L.Ed.2d 786 (1977).

38. *See NAACP v. Medical Center*, 657 F.2d at 1333–34; *Board of Education of City School District v. Califano*, 584 F.2d 576, 589 (2d Cir. 1978), *aff'd on other grounds sub nom. Board of Education New York City v. Harris*, 444 U.S. 130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979). *Compare Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985).

39. *See* 20 U.S.C. §§ 1720(a) & (b); 20 U.S.C. §§ 881(f) & (k); 20 U.S.C. § 3381(f) & (k).

40. *General Building Contractors Ass'n. v. Pennsylvania*, 458 U.S. 375, 399, 102 S.Ct. 3141, 3154, 73 L.Ed.2d 835 (1982); *Swann v. Charlotte-Mecklenburg Bd. of Educa.*, 402 U.S. 1, 22–23, 91 S.Ct. 1267, 1269, 28 L.Ed.2d 554 (1971); *Pasadena Bd. of Educ. v. Spangler*, 427 U.S. 424, 436, 96 S.Ct. 2697, 2704–05, 49 L.Ed.2d 599 (1976); *Milliken v. Bradley*, 418 U.S. 717, 746–47, 94 S.Ct. 3112, 3128, 41 L.Ed.2d 1069 (1974).

41. *Milliken v. Bradley (Milliken II)*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).