# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVE SANDERS, Individually and
as Class Representative,
            *Plaintiff-Appellant,*

            v.

EDMUND G. BROWN Jr.,* in his
official capacity as Attorney
General of the State of California;
PHILIP MORRIS USA, INC.; R.J.
REYNOLDS TOBACCO COMPANY;
BROWN & WILLIAMSON TOBACCO
CORP.; LORILLARD TOBACCO
COMPANY,
            *Defendants-Appellees.*

No. 05-15676

D.C. No.
CV-04-02281-SI

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Yvonne Illston, District Judge, Presiding

Argued and Submitted
February 15, 2007—Stanford, California

Filed September 26, 2007

Before: Betty B. Fletcher, Richard R. Clifton, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Clifton

---

*Edmund G. Brown Jr. is substituted for his predecessor, Bill Lockyer, as Attorney General of the State of California, pursuant to Fed. R. App. P. 43(c)(2).

13205

## COUNSEL

A. William Urquhart, Thad A. Davis, Kent J. Bullard, Kathleen M. Sullivan (argued), Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles and Redwood Shores, California; for the appellant.

Attorney General Edmund G. Brown Jr., Chief Assistant Attorney General Tom Greene, Senior Assistant Attorney General Dennis Eckhart, Deputy Attorney General Margaret

Spencer, Deputy Attorney General Karen Leaf (argued), State of California, Sacramento, California; Darryl Snider (argued), James F. Speyer, Eric Shapland, Heller Ehrman LLP, Los Angeles, California; for the appellees.

## OPINION

CLIFTON, Circuit Judge:

This case involves an indirect legal challenge to the massive settlement agreement between the nation's largest tobacco companies and the attorneys general of 46 states and several territories. The 1998 settlement known as the Master Settlement Agreement, or "MSA," resolved all of these states' and territories' claims against those tobacco companies, which the states had sued for billions of dollars in damages related to the harmful effects of smoking.

Plaintiff Steve Sanders, a smoker, alleges that cigarette prices have skyrocketed in the nine years since the MSA, and that the price increases are the result of an illegal price-fixing scheme that the MSA enabled. On behalf of a putative class of cigarette smokers, Sanders sued the Attorney General of the State of California and the four largest tobacco companies: Philip Morris USA Inc., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Corp., and Lorillard Tobacco Co.[1] Sanders does not allege that the MSA itself is illegal, but rather alleges that the MSA, the post-MSA price increases, and the state statutes implementing the MSA's terms (the "implementing statutes") are evidence of a cigarette price-fixing cartel that violates the Sherman Act, 15 U.S.C. § 1 *et seq.*; the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et*

---

[1]Unless otherwise noted, this opinion will refer to the tobacco companies as "tobacco defendants" and the attorney general as "the State of California." It will use the term "defendants" when referring to both groups collectively.

*seq.*; other California unfair competition statutes, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and California's common law of unfair competition. Sanders also alleges that the Sherman Act preempts the implementing statutes.

The defendants moved to dismiss under Fed. R. Civ. P. 12(b)(6). The district court granted the motions and dismissed the claims with prejudice. *See Sanders v. Lockyer*, 365 F. Supp. 2d 1093 (N.D. Cal. 2005). The district court held that the Sherman Act does not preempt the implementing statutes; that Sanders failed to adequately plead an antitrust violation; and that even if Sanders had done so, the defendants were immune from liability. We affirm.

I.   Background

The following facts are undisputed for the purpose of the motion to dismiss, unless otherwise noted. The United States cigarette market is dominated by four companies: Philip Morris USA Inc., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Corp., and Lorillard Tobacco Co. Their combined sales have accounted for more than 90 percent of cigarette sales for at least the last decade.

These four companies in the 1990s faced coordinated lawsuits by the attorneys general of most states and U.S. territories, who sought money and other relief to help their governments cope with the harmful effects of smoking and the costs imposed by those effects. In late 1998, the tobacco companies and the attorneys general signed the MSA.[2] State courts, including the California Superior Court, then approved the MSA in consent decrees and dismissed the lawsuits against the tobacco companies.

---

[2]The MSA in its entirety can be found at www.naag.org/backpages/naag/tobacco/msa/msa-pdf (last visited Aug. 23, 2007).

The MSA requires the four major tobacco companies — who, as the initial signatories of the MSA, are known as the "Original Participating Manufacturers" — to pay the states billions of dollars each year. The total annual payments are based on a formula that considers inflation and the total number of individual cigarettes sold in the fifty United States, the District of Columbia and Puerto Rico. Each Original Participating Manufacturer (or "OPM") must annually contribute a portion of the total payment that is equal to the OPM's share of that year's cigarette sales (the OPM's "market share"). For example, if an OPM's market share is 25 percent, that OPM must contribute 25 percent of that year's settlement payment.

The OPMs expected to raise cigarette prices to help pay for the settlement and feared that smaller manufacturers, which were not part of the negotiations, would seize the chance to compete with cheaper cigarettes, possibly cutting into the OPMs' market share. The settling parties addressed this problem in three ways. First, the MSA offered a carrot to non-OPM tobacco companies to join the settlement agreement. These "Subsequent Participating Manufacturers" ("SPMs") could join the settlement within 90 days of the enactment of the MSA. They would not have to make any part of the payments due to the states so long as their market share remained at or below their 1998 market share (or 125 percent of their 1997 market share, whichever was greater). If an SPM's market share increased, however, the SPM would have to contribute to the settlement payment, with the contribution based on the sales in excess of the SPM's 1998 sales (or 125 percent of 1997 sales, if applicable). For example, if an SPM sold 250,000 cigarettes in 1998, and then one year later sold a larger share of the market — say, 300,000 cigarettes — the SPM would have to contribute to the settlement payment. If the extra 50,000 cigarettes equaled 1 percent of the market share, the SPM would have to pay 1 percent of the settlement

payment. As of August 15, 2007, forty-four smaller tobacco companies are participating in the MSA as SPMs.[3]

Second, the OPMs would pay less money under the MSA if their total sales dropped below a certain amount. If the reason for this drop is competition by tobacco companies that did not participate in the MSA, the settlement payment would be reduced even further.

Third, most states have enacted two sets of statutes that allegedly make it harder for non-signatory tobacco companies (and any future market entrants) to undercut the OPMs' and SPMs' market shares. Sanders alleges that the states were motivated to pass these statutes out of fear that the OPMs' higher prices would cause their market share to fall, thereby reducing the amount of the settlement payments to the states. These "implementing statutes" are known in most states as the "Qualifying Act" and the "Contraband Amendment."

Under the "Qualifying Act," non-signatory tobacco companies (also known as "Non-Participating Manufacturers," or "NPMs") have to pay a portion of their revenues into an escrow account. The money in the escrow account acts as a liability reserve. If the NPMs are successfully sued for cigarette-related harms, the money in the escrow accounts will pay the damage awards. Each NPM's payment is based on market share, and is roughly the same per-cigarette cost as the amount that OPMs must pay to abide by the MSA. The payments can only be used to pay a judgment or settlement on a claim against the NPM, up to the amount that the NPM would otherwise pay under the MSA. Any remaining funds in the escrow account revert back to the NPM after twenty-five years.

---

[3]The list can be found on the website of the National Association of Attorneys General, www.naag.org/backpages/naag/tobacco/msa/ participating _manu/ (last visited Aug. 22, 2007).

This law allegedly prevents the NPMs from undercutting the prices of OPMs' cigarettes by taking away the extra profitability that an NPM would enjoy. For example, say that OPMs' sales are such that for a given year, they must pay 25 cents per cigarette to the states under the MSA. This would seem to give NPMs a cost advantage of 25 cents per cigarette. But under the Qualifying Act, if an NPM also sold cigarettes that year, the NPM would have to pay roughly 25 cents per cigarette into an escrow account, which the NPM could not touch for 25 years. In other words, the NPM's cost advantage over the OPMs is erased.

The "Contraband Amendment," for its part, penalizes NPMs who refuse to make escrow payments under the Qualifying Act. The Contraband Amendment allows a state to "de-list" NPMs from a list of approved tobacco manufacturers. De-listing effectively prevents the offending NPM from selling cigarettes in that state.

The California legislature has enacted a Qualifying Act and a Contraband Amendment. Cal. Health & Safety Code §§ 104556, 104557 (Qualifying Act); Cal. Bus. & Prof. Code § 22979(a), (b), and Cal. Rev. & Tax Code § 30165.1(d), (e) (Contraband Amendment).

As expected, the OPMs' cigarette prices rose when the MSA took effect. Sanders alleges, however, that the price increases have far exceeded the tobacco companies' costs of complying with the MSA. The OPMs allegedly raised their prices by $12.20 per carton between late 1998 and early 2002 — more than twice the amount necessary to meet the OPMs' obligations under the MSA. Also, the price increases have been "parallel." Whenever one OPM has raised its cigarette prices, the others have generally matched the increase. Despite these increases, the OPMs' cigarette sales still account for more than 90 percent of the market.

The price increases and other factors have prompted several legal challenges against the MSA, most alleging antitrust and

constitutional violations. The challenges have been largely unsuccessful. *See, e.g.*, *Trident Int'l Corp. v. Kentucky*, 467 F.3d 547 (6th Cir. 2006); *Mariana v. Fisher*, 338 F.3d 189 (3d Cir. 2003); *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001); *Xcaliber Int'l Ltd. v. Kline*, No. 05-2261-JWL, 2006 WL 288705 (D. Kan. Feb. 7, 2006); *Xcaliber Int'l Ltd. v. Edmondson*, No. 04-CV-0922-CVE-PJC, 2005 WL 3766933 (N.D. Okla. Dec. 13, 2005); *S & M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604 (M.D. Tenn. 2005); *PTI, Inc. v. Philip Morris Inc.*, 100 F. Supp. 2d 1179 (C.D. Cal. 2000); *Forces Action Project LLC v. California*, No. C99-0607 MJJ, 2000 WL 20977 (N.D. Cal. Jan. 5, 2000), *aff'd in relevant part*, No. 00-15280, 16 Fed. Appx. 774 (9th Cir. Aug. 15, 2001) (unpublished disposition); *Hise v. Philip Morris Inc.*, 46 F. Supp. 2d 1201 (N.D. Okla. 1999), *aff'd*, 208 F.3d 226 (10th Cir. 2000) (unpublished disposition). *But see Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205 (2d Cir. 2004).

## II.   The Present Case

Sanders alleges that the MSA has spawned a "cartel" because it lets the participating tobacco companies "raise prices without fear of losing sales or market share." Sanders does not allege that the tobacco companies have agreed amongst themselves to fix prices. Instead, he alleges that the MSA penalizes tobacco companies for competing on price, because they have to pay more money under the MSA as their market shares increase. As a result, tobacco companies allegedly will be reluctant to increase market share. Thus, when one tobacco company raises its prices, all other tobacco companies allegedly can raise prices in lockstep without fearing that their rivals will try to undercut them. "[I]n effect," the complaint alleges, "the OPMs have agreed to compensate each other [f]or any market share increase . . . by imposing a

proportionate increase in the settlement payment for such market share gain."[4]

Sanders also alleges that the MSA encouraged other tobacco companies to join the cartel. Any company that has joined the MSA as an SPM will be reluctant to increase its market share beyond 1998 levels, because by doing so it would be forced to pay some money to the states.[5] As a result, the SPMs followed the OPMs when they increase their prices.

Sanders further alleges that the MSA encouraged the states to pass anti-competitive laws protecting the alleged cartel from price competition. This is because the OPMs' payments to the states drop if their total sales drop below a threshold level, or if non-signatory NPMs take away OPMs' market share. The states, Sanders alleges, therefore passed the Qualifying Acts and Contraband Amendments to keep NPMs from entering the market.

The sum of these parts, Sanders alleges, is an illegal "horizontal output-restriction cartel" in which the OPMs, backed by state authority (or, at least, state acquiescence), have raised cigarette prices to artificially high (or "supracompetitive") levels without fear of price competition. This scheme is preempted by the Sherman Act, Sanders argues, because it so obviously conflicts with federal antitrust law. Furthermore, Sanders argues that even if the scheme consisting of the MSA and its implementing statutes is not facially preempted, the

---

[4]It is not clear that a proportionate price increase, which would not affect the per-cigarette cost of doing business, would dissuade a tobacco company from attempting to increase its market share. We need not, however, address the merits of this claim, as the following discussion will show.

[5]It is not clear whether this extra payment would really dissuade the SPM from seeking extra market share. If an SPM would pay to the states less money than it would make by selling extra cigarettes, an SPM still might turn a higher profit by increasing its market share. Again, we need not address the merits of this claim.

tobacco defendants have still committed illegal price-fixing, as evidenced by the parallel price increases. Finally, Sanders argues that the State of California failed to adequately supervise the tobacco companies' pricing actions.[6]

The defendants filed motions to dismiss, arguing, among other things, that they are immune to antitrust liability under either (1) the *Noerr-Pennington* immunity doctrine, described in *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135-145 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 669-70 (1965); or (2) the "state action" immunity doctrine that originated in *Parker v. Brown*, 317 U.S. 341, 350-52 (1943).

The district court granted the motions to dismiss. *See Sanders*, 365 F. Supp. 2d at 1105. The district court held that the Sherman Act did not preempt the MSA implementing statutes because those statutes do not authorize any *per se* illegal activity. *See id.* at 1101. The district court also held that the state action immunity doctrine protected the defendants from suit because the MSA and its implementing statutes were

---

[6]The relief Sanders seeks includes:

> (1)   A declaratory judgment that California's Qualifying Act and Contraband Amendment are both "facially void as a *per se* restraint of trade," and therefore preempted by the Sherman Act.

> (2) An injunction against the state to keep it from enforcing the MSA and the implementing statutes, and against the tobacco defendants to make them "cease their anticompetitive activity taken in furtherance of the MSA."

> (3)   Money damages against the tobacco defendants for operating an illegal price-fixing cartel.

Sanders's complaint also seeks to enjoin implementation of the "anticompetitive provisions" of the MSA. His appeal, however, does not address whether the MSA itself is illegal. Sanders instead argues that the MSA is one part of a larger illegal scheme. We therefore need not address whether the MSA itself would be legal in the absence of the alleged larger scheme.

formed by sovereign state acts that cannot be challenged under federal antitrust law. *See id.* at 1098-1101, 1103-05. The district court further held that the defendants were entitled to *Noerr-Pennington* immunity because their acts of negotiating and entering into the MSA constituted protected speech. *See id.* at 1101-03. Finally, the district court held that Sanders's state law claims failed because the defendants were immune to those claims as well. *See id.* at 1104-05.

## III. Analysis

A dismissal under Rule 12(b)(6) is reviewed *de novo*. *See Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). All allegations of fact are taken as true. *See id.* Conclusory allegations and unreasonable inferences, however, are insufficient to defeat a motion to dismiss. *See Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).

Review is generally limited to the contents of the complaint, but a court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document. *See Warren*, 328 F.3d at 1141 n.5. We therefore can analyze the MSA, which is obviously central to the claim, in evaluating the strength of Sanders's allegations.

### A. Preemption

Sanders argues that California's Qualifying Act and Contraband Amendment are preempted by Section 1 of the Sherman Act, which states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. To be preempted by this Act, a state statute must be in "irreconcilable" conflict with the federal antitrust regulatory scheme. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). The only way such a conflict can exist, according to

the Supreme Court, is if the state statute "mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party" to violate those laws. *Fisher v. City of Berkeley*, 475 U.S. 260, 265 (1986) (quoting *Rice*, 458 U.S. at 661) (internal quotation marks omitted). A conflict that is "hypothetical or potential" is "insufficient" to warrant preemption. *Rice*, 458 U.S. at 659. Thus, a state statute is only preempted by the Sherman Act "when the conduct contemplated by the statute is in all cases a *per se* violation. If the activity addressed by the statute does not fall into that category . . . the statute cannot be condemned in the abstract." *Id.* at 661.

Neither the Qualifying Act nor the Contraband Amendment explicitly allow price fixing, market division, or other *per se* illegal monopolistic behavior. Sanders argues, however, that these statutes create such high barriers to NPMs' market entry and ability to price-compete that they have "virtually guaranteed collusion and monopoly prices in the cigarette market." (Quoting 1 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 226(a), at 35 (2006 Supp.)). The statutes therefore place irresistible pressure on all cigarette companies to fix prices, Sanders argues.

[1] The statutes do place some pressure on some new-entrant tobacco companies to charge higher prices if they decide to enter the market. The Qualifying Act forces NPMs to place into escrow a per-cigarette payment roughly equal to the per-cigarette payment that participating manufacturers pay under the MSA. The Contraband Amendment prevents NPMs who fail to make the escrow payments from distributing their cigarettes. If NPMs wish to remain profitable, they must factor the escrow payments into the prices they charge per cigarette. The statutes thus may cause higher prices and dissuade some potential market entrants. Nothing, however, forces the NPMs to either peg their prices to those of participating manufacturers, or to refrain altogether from entering the market.

If the OPMs really are charging artificially high prices, and thus making artificially high profits, an NPM conceivably could compete on price by charging a "normal" price and still make a "normal" profit, even taking the escrow payment into account.

[2] Sanders therefore has failed to adequately allege that the implementing statutes mandate or authorize conduct that "in all cases" violates federal antitrust law. *See Fisher*, 475 U.S. at 265 (quoting *Rice*, 458 U.S. at 661) (internal quotation marks omitted). The implementing statutes are thus not preempted by the Sherman Act. *See, e.g.*, *Trident*, 467 F.3d at 557-58 (holding that Kentucky statutes implementing the MSA in that state were not preempted because they did not mandate or authorize illegal activity "in all cases").[7]

B.    Immunity

Sanders next argues that even if the Sherman Act does not preempt the implementing statutes, the tobacco companies have nonetheless violated the Act by using the MSA and implementing statutes to create a price-fixing cartel. The state of California, for its part, has allegedly fostered this cartel either by passing the implementing statutes and thus encour-

---

[7]The Second Circuit has held that the MSA and its companion statutes are preempted by federal law. *See Freedom Holdings*, 357 F.3d at 222-32. The *Freedom Holdings* opinions (both the original and the denial of the petition for rehearing) feature forceful economic arguments on how tobacco companies could potentially use the MSA and its companion statutes to minimize price competition and keep new entrants out. The court concludes that the "alleged arrangement, even without the protection of the Contraband Statutes . . . would be a *per se* violation because it is a naked restraint on competition . . . . With the Contraband Statutes in force, the scheme as alleged threatens to become a permanent, nationwide cartel." 357 F.3d at 226. *Freedom Holdings*, however, ignores the *Rice* requirement that the statute "in all cases" mandate *per se* illegal conduct. The Sixth Circuit in *Trident* disagreed with *Freedom Holdings* for that very reason. *Trident*, 467 F.3d at 557-58. We agree with the Sixth Circuit and, likewise, decline to follow the Second Circuit's approach.

aging price-fixing, or at least by failing to prevent it from happening.

The defendants argue that Sanders has failed to allege any conduct that would violate the Sherman Act. The defendants also argue that even if Sanders has adequately pleaded Sherman Act violations, they are nonetheless immune from prosecution under the *Noerr-Pennington* immunity doctrine, the state action doctrine, or both.

### 1. *Noerr-Pennington* immunity

The tobacco defendants argue that their acts of (1) negotiating the MSA, (2) petitioning the California courts for approval of the MSA, and finally (3) acting according to the MSA's terms, are constitutionally protected from antitrust liability under the *Noerr-Pennington* immunity doctrine.

**[3]** The *Noerr-Pennington* doctrine arises from two Supreme Court cases, *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135-145 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 669-70 (1965). The Court, citing First Amendment and federalism concerns, held that private actors are immune from antitrust liability for petitioning the government, even when the private actors' motives are anticompetitive. *Noerr-Pennington* immunity protects petitions to all departments of the government. *See Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1059 (9th Cir. 1998).

**[4]** The Supreme Court has interpreted "petitioning" to encompass activities other than legislative lobbying. For example, *Noerr-Pennington* immunity protects private actors when they file court documents and enter contracts with the government. *See Trucking Unlimited*, 404 U.S. at 510; *see also Greenwood Utilities Comm'n. v. Mississippi Power Co.* (*Greenwood Utilities*), 751 F.2d 1484, 1505 (5th Cir. 1985).

Neither the Supreme Court nor the Ninth Circuit have specifically held that a settlement agreement like the MSA qualifies as "petitioning" that may be protected by *Noerr-Pennington* immunity. The Seventh Circuit, however, has explicitly held that *Noerr-Pennington* immunity protects private parties from liability for negotiating and entering into settlements or other agreements with the government. *See Campbell v. City of Chicago*, 823 F.2d 1182, 1186-87 (7th Cir. 1987). We now join that circuit in so holding.

In *Noerr*, the Supreme Court reasoned that petitioning of government officials deserved immunity from antitrust liability for two reasons. 365 U.S. at 137-38. First, allowing liability for such petitions would "substantially impair the power of [state] government to take actions through its legislature and executive that operate to restrain trade." *Id.* at 137. Second, "[t]he right of petition is one of the freedoms protected by the Bill of Rights," and nothing in the Sherman Act indicated an intent to "invade" that freedom. *Id.* at 138. Furthermore, the Court concluded that it is inappropriate to base liability on whether a petitioner has an anticompetitive motive, because that would unduly chill speech:

> It is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed. And it seems equally inevitable that those conducting the campaign would be aware of, and possibly even pleased by, the prospect of such injury. To hold that the knowing infliction of such injury renders the campaign itself illegal would thus be tantamount to outlawing all such campaigns.

*Id.* at 143-44.

[5] The act of negotiating a settlement with a state undoubtedly is a form of speech directed at a government entity.

Given the Court's desire to protect free speech from Sherman Act attack, it is clear why *Noerr-Pennington* immunity should protect a private party from liability for such an act. If a person undertaking to negotiate a way out of his legal troubles were to fear that the very act of negotiating would expose him to further liability, he might be afraid to attempt a settlement in the first place. The result would be fewer settlements, even when the parties would otherwise be willing to reach a principled compromise, and more cases dragging on for years to the detriment of all parties, not to mention the court system.

Furthermore, holding that a private party's settlements with the government are exposed to antitrust liability would surely, as the Supreme Court in *Noerr* warned, "substantially impair the power of [state] government to take actions through its legislature and executive that operate to restrain trade." *Id.* at 137. If a state can restrain trade through its "legislature and executive," that means the attorney general, an executive officer, can negotiate trade restraints in the context of litigation, so long as those restraints are not preempted by the Sherman Act.

**[6]** We therefore hold that *Noerr-Pennington* immunity protects a private party from liability for the act of negotiating a settlement with a state entity.[8] Immunity thus protects the tobacco defendants from liability for the act of negotiating the MSA with the State of California.

Sanders argues that even if *Noerr-Pennington* immunity protects the defendants from liability for the MSA itself, it does not protect the tobacco defendants from liability for increasing prices after the MSA. Sanders bases his argument on the plurality opinion in *Cantor v. Detroit Edison Co.*, 428

---

[8]We do not address whether *Noerr-Pennington* immunity may protect an anticompetitive settlement agreement between two *private* entities, who conceivably could claim that the act of petitioning the court to accept their agreement immunizes the agreement itself.

U.S. 579 (1976). In *Cantor,* a private utility gave free light bulbs to customers, an act that allegedly harmed light bulb retailers. *See id.* at 581-82. Even though the free-bulb program had technically been "approved" by state regulators — it was included in the utility's proposed rate plan — the plurality declined to extend *Noerr-Pennington* immunity to the program. The plurality said that "nothing in the *Noerr* opinion implies that the mere fact that a state regulatory agency may approve a proposal . . . and thereby require that the proposal be implemented . . . is a sufficient reason for conferring antitrust immunity on the proposed conduct." *Id.* at 601-02. Justice Blackmun, concurring separately, said he agreed with the plurality "insofar as it holds that the fact that anticompetitive conduct is sanctioned, or even required, by state law does not of itself put that conduct beyond the reach of the Sherman Act." *Id.* at 605 (Blackmun, J., concurring in the judgment).

Subsequent cases cast doubt on the precedential value of this fragmented opinion. The Court itself undercut the *Cantor* plurality in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988), in which the Court stated that " 'where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action,' those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint." *Id.* at 499 (quoting *Noerr*, 365 U.S. at 136) (internal alteration omitted).

The lower courts have also interpreted *Cantor* narrowly. In *Greenwood Utilities*, the Fifth Circuit held that *Cantor* "cannot support" a broad rule that *Noerr-Pennington* immunity never extends to the consequences of government acts that result from immunized petitioning. *See* 751 F.2d at 1504. Such a rule would weaken *Noerr-Pennington*, the Fifth Circuit held: "First Amendment petitioning privileges would indeed be hollow if upon achieving a petitioned-for end the petitioner were then subjected to antitrust liability for his success." *Id.* at 1505. The Fifth Circuit distinguished *Cantor* because, in that case, the private actor (not the government)

had independently created the restraint. *See id.* at 1504. The Fifth Circuit therefore held that *Noerr-Pennington* immunity extends to restraints that are created by the government in response to private-party petitions, as long as those restraints are "not simply government approval of private conduct." *Id.*; *see also Bonollo Rubbish Removal, Inc. v. Town of Franklin*, 886 F. Supp. 955, 965 (D. Mass. 1995) ("A *Noerr-Pennington* doctrine which shielded a private party in its attempt to secure a benefit from the government but left the party open to suit if the benefit was actually received would not serve the interests of free speech and open access to government that the *Noerr* and *Pennington* Courts intended to protect.").

**[7]** For our part, we have followed *Allied Tube* and explicitly held that *Noerr-Pennington* immunity protects a private party from liability not only for the petition, but also for any injuries that result "directly" from valid government action taken on the petitioner's behalf. *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 17 F.3d 295, 299 (9th Cir. 1994). This rule is dispositive of Sanders's case, to the extent the injury he alleges — supracompetitive cigarette prices — resulted directly from the action of the State of California, that is, from "the MSA and the Attorney General's enforcement of the escrow statute and contraband statute." Although subsequent agreements by the plaintiffs to engage in the "operation of an output cartel" might not be immune from liability under this rule, Sanders's complaint does not allege any such subsequent agreement in restraint of trade. Therefore, because Sanders's complaint is based on injuries caused directly by government action, *Noerr-Pennington* immunity shields the tobacco defendants from liability for the alleged supracompetitive price increases.[9] Since Sanders's claim against the tobacco

---

[9]The Second Circuit in *Freedom Holdings* found that the MSA implementing statutes were not themselves protected by *Noerr-Pennington* immunity because "the immunity for advocacy cannot sensibly protect the resultant anticompetitive legislation from being held to be preempted as in conflict with the Sherman Act. Otherwise, all such legislation would be immune." 357 F.3d at 233. This holding may be correct, but the defendants here do not claim that *Noerr-Pennington* immunity protects the implementing statutes from preemption.

defendants is predicated on these price increases, his claim against the tobacco defendants must fail.

### 2. State action immunity

The State of California, for its part, argues that state action immunity, or "*Parker* immunity," protects it from liability both for entering into the MSA and for enacting the implementing statutes. We agree.

[8] The *Parker* immunity doctrine protects most state laws and actions from antitrust liability. The doctrine originated in *Parker v. Brown*, 317 U.S. 341, 350-52 (1943). In *Parker*, the Court dismissed a Sherman Act challenge to a California law that restricted competition among raisin manufacturers. The Court held that nothing in the Sherman Act suggests its purpose is "to restrain a state or its officers or agents from activities directed by its legislature." *Id.* at 350-51. Thus, even a state law that would violate the Sherman Act is immune from attack on antitrust grounds. *See id.* The only exception to this rule is a state law that attempts to "give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Id.* at 351.

The Supreme Court has never specified what conduct comprises a state action that is "directed" by the state legislature and is therefore immune. In post-*Parker* cases, however, the Supreme Court has articulated some general tests to help decide whether a particular action qualifies for *Parker* immunity. A threshold question, therefore, is whether a court-approved settlement like the MSA may be protected by *Parker* immunity. The next question is whether the MSA scheme in particular meets the Supreme Court criteria for *Parker* immunity.

[9] The answer to the first question is clear under our court's precedents. If a government entity enters into a settlement like the MSA, the settlement is a "state action" that may

be protected by *Parker* immunity. We have held that *Parker* covers not only state legislation, but also the acts of courts and executive-branch officials. *See Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869, 876 (9th Cir. 1987); *Deak-Perera Hawaii, Inc. v. Dept. of Transportation*, 745 F.2d 1281, 1283 (9th Cir. 1984). The MSA in particular seems to involve several state actions. To begin with, the lawsuits against the tobacco defendants were initially filed by the states. Even though private tobacco companies initiated the settlement negotiations, the California attorney general ultimately approved the MSA, and the state court approved the settlement in a consent decree and final judgment. The MSA thus fits the basic definition of "state action" for *Parker* purposes.

[10] The second question — whether the MSA scheme meets all the criteria for *Parker* immunity — is considerably more complex. Even though the MSA is probably a state act, it does not necessarily qualify for *Parker* immunity from antitrust liability. A series of Supreme Court cases holds that any action in restraint of trade is only immune if it satisfies a two-part test: The anticompetitive policy not only must be (1) "clearly articulated and affirmatively expressed as state policy," but also must be (2) "actively supervised by the state itself." *Cal. Retail Liquor Dealers Ass'n. v. Midcal Aluminum, Inc.* (*Midcal*), 445 U.S. 97, 105 (1980) (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410 (1978) (plurality opinion)) (internal quotation marks omitted); *see also 324 Liquor Corp. v. Duffy*, 479 U.S. 335, 343-44 (1987); *Patrick v. Burget*, 486 U.S. 94, 100 (1988); *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 631 (1992). Other Supreme Court cases, however, explicitly hold that a state's own acts in the antitrust area are always immune; these cases suggest that the two-part "*Midcal* test" is only needed to decide whether private conduct pursuant to a state statute gets *Parker* immunity. In other words, a state need not show it "actively supervises" private parties, as long as the state itself, acting as sovereign, created the restraint of trade. *See Hoover v. Ron-*

*win*, 466 U.S. 558, 568-69 (1984); *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 377-79 (1991).

It is unclear whether *Hoover* and *Midcal* are coexisting "live" precedents, or whether one overrules the other. It is possible that the *Midcal* test is limited, as *Hoover* suggests, to cases in which the courts must decide whether private conduct is actually protected "state action." The *Midcal* line of cases, however, never mentions the *Hoover* line of cases, even though they chronologically overlap. Indeed, *324 Liquor,* which was decided after *Hoover*, explicitly states that the way a state statute gets *Parker* immunity is by satisfying the two-part *Midcal* test. *See* 479 U.S. at 343-44. Since *324 Liquor* never mentions *Hoover*, it is unclear whether the Supreme Court was saying that even sovereign state acts must meet the *Midcal* test (therefore overruling *Hoover* without saying so) or merely applying the *Midcal* test in an appropriate circumstance (by analyzing whether private conduct gets *Parker* immunity).

Whether the *Midcal* test applies to the MSA is a critical question for the present case. The lower courts have split on whether the MSA should get *Parker* immunity, chiefly because some apply *Midcal*, and some — following the *Hoover* precedent — do not. *Compare Bedell*, 263 F.3d at 259-65 (applying the *Midcal* test and finding no *Parker* immunity); *Freedom Holdings*, 357 F.3d at 226-32 (same), *with PTI*, 100 F. Supp. 2d at 1195-96 (citing *Hoover*, declining to apply *Midcal*, and holding that *Parker* immunity protects defendants from liability); *S & M Brands*, 393 F. Supp. 2d at 621-29 (same).

Sanders argues that the *Midcal* test is appropriate here and reasons that since California has never "actively supervised" the tobacco defendants' price increases, state action immunity protects none of the defendants from antitrust liability. The defendants, however, argue that the *Midcal* test is inappropriate because the MSA and the implementing statutes were

"sovereign acts," and that under *Hoover*, the MSA, the Qualifying Act and the Contraband Amendment are automatically immune from suit.

Our circuit precedent indicates that the defendants are correct. In *Deak-Perera Hawaii*, we held that a state "acting as sovereign" is "immune from the federal antitrust laws." 745 F.2d at 1282 (internal citations and quotation marks omitted). We distinguished *Midcal* by noting that "this is not a case of private parties imposing competitive restraints in conjunction with state authorities. In such a case the inquiry would be different." *Id.* at 1283; *see also Charley's Taxi*, 810 F.2d at 875-76 (following *Deak-Perera*).

Nonetheless, Sanders argues that the *Midcal* line of cases have overruled *Hoover*, and that *Deak-Perera* and *Charley's Taxi* therefore are dead precedents. Sanders points to Ninth Circuit cases that, like the *Midcal* line of cases, apply the *Midcal* test without considering the *Hoover* rule that sovereign state acts are *per se* immune. *See*, *e.g.*, *Snake River Valley Elec. Ass'n. v. Pacificorp*, 238 F.3d 1189, 1192-95 (9th Cir. 2001). Even though these cases might be read to shed some doubt on *Hoover*'s viability, we conclude that the *Hoover* rule survives both logical scrutiny and a semantic parsing of the *Midcal* cases.

First, it makes no sense to apply the *Midcal* test to a sovereign state act. *Midcal* holds that an anticompetitive restraint is protected under *Parker* only if the state "actively supervise-[s]" the anticompetitive conduct. 445 U.S. at 105. *Parker*, however, appears to extend immunity from antitrust liability to all government officers' acts if those acts are "directed by [a state's] legislature." 317 U.S. at 350-51. If the *Midcal* test applied to those government officers' acts, it would dramatically narrow the scope of immunized acts to those in which the government took an active role in supervising the marketplace. Rigid pricing schemes in which the state government itself sets prices for products, and enforces penalties on those

who violated the controls, might be immune from antitrust liability, but gentler schemes that restrained competition without engaging in onerous "active supervision" might be illegal. Such a rule appears to conflict with a key holding of *Parker:* that the Sherman Act is not intended to interfere with state attempts to impose market restraints. *See Parker*, 317 U.S. at 350-51.

Second, the holding in *Hoover* is broader than the holdings in the *Midcal* line of cases. The Court in *Hoover* said that "[t]he starting point in *any* analysis involving the state-action doctrine is the reasoning of *Parker v. Brown*." 466 U.S. at 567 (emphasis added). Since *Parker* held that state acts are immune from antitrust liability, the *Hoover* Court reasoned, "[w]here the conduct at issue is in fact that of the state legislature or supreme court, we need not address the issues of 'clear articulation' and 'active supervision.' " *Id*. at 569. "Closer analysis" is only required "when the activity at issue is not directly that of the legislature or supreme court, but is carried out by others pursuant to state authorization." *Id.* at 568. In short, *Hoover* clearly states that the *Midcal* test does not apply to sovereign state acts, which are immune from antitrust liability so long as they avoid preemption by authorizing *per se* illegal activities.

*Midcal*, however, makes no such blanket statements. In that opinion, the Court was chiefly concerned with how to distinguish between a private price-fixing scheme and an immunized state act. Indeed, each of the *Midcal* line of cases involved a private body — not a state — making anticompetitive decisions under the aegis of a state regulatory scheme. In *Midcal* and *324 Liquor*, the Court considered whether state-authorized pricing schemes for wholesale alcohol, which gave price-fixing control to private parties, had enough active state supervision to qualify for *Parker* immunity. *Midcal*, 445 U.S. at 103-06; *324 Liquor*, 479 U.S. at 342-45. In *Ticor*, the Court examined whether states had given too much leeway to title search companies to set their own rates. 504 U.S. at 632-40.

And in *Patrick v. Burget*, the Court analyzed a state-authorized, but privately-run, medical review board that allegedly restricted competition among doctors. 486 U.S. at 99-106.

Furthermore, the Supreme Court has repeatedly hinted that the *Midcal* test is limited only to situations in which private bodies operate under state regulatory authority. In *Southern Motor Carriers Rate Conf., Inc. v. United States*, 471 U.S. 48 (1985), the Court stated that *Midcal*'s two-pronged test is "applicable to private parties' claims of state action immunity," but said nothing about whether the test applied to sovereign state acts. 471 U.S. at 61. In *Ticor*, the Court clarified that in *Midcal*, "we announced the two-part test *applicable to instances where private parties participate in a price-fixing regime*." 504 U.S. at 633 (emphasis added).

**[11]** *Hoover* therefore controls in cases where the state, acting as a sovereign, imposes restraints on competition. The state in such situations is immune from antitrust liability, regardless of whether the restraint in question would satisfy the *Midcal* test.

**[12]** Since the California attorney general's act of entering into the MSA is a sovereign act, as are the legislature's actions in enacting the Qualifying Act and Contraband Amendment, the state is immune from antitrust liability for these actions, unless the MSA scheme is an attempt to "give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Parker*, 317 U.S. at 351. The MSA and the implementing statutes authorize no illegal activity, as we discussed above in analyzing whether the implementing statutes are preempted. *See* Part III.A *supra*. We therefore hold that *Parker* immunity protects the state from antitrust liability for entering into the MSA and for passing the implementing statutes.

In so holding, we recognize that we disagree with two other circuits. The Second Circuit in *Freedom Holdings* and the Third Circuit in *Bedell* applied the *Midcal* analysis and held that *Parker* immunity does not protect the state from liability for entering into the MSA. *Freedom Holdings*, 357 F.3d at 226-32; *Bedell*, 263 F.3d at 259-66. As discussed above, however, we believe the *Midcal* analysis would only be appropriate if the MSA is not a sovereign act, which we conclude it is.

We also reject the *Bedell* Court's conclusion that the MSA is not a sovereign state act, but rather resembles a "hybrid restraint" existing somewhere outside the realm of *Parker* immunity. *Bedell*, 263 F.3d at 258. To explain why we disagree, it is necessary to briefly touch on the concept of a "hybrid restraint."

A hybrid restraint is one form of state law that is illegal *per se* under the Sherman Act. *See Fisher*, 475 U.S. at 267-270. A hybrid restraint exists when the state creates "nonmarket mechanisms [that] merely enforce private marketing decisions." *Id.* at 267-68. In other words, it exists when the state passes laws that enforce companies' decisions to collude on prices, to dictate prices by which other companies must abide, or to otherwise violate the Sherman Act.

Ninth Circuit and Supreme Court cases provide a few examples of hybrid restraints. Each of these cases hinged on a state's decision to let producers dictate market conditions to others — for example, by "posting" prices that then became legally binding on buyers and other producers. *See id.* at 268-69 (characterizing as hybrid restraints the price-posting schemes that had been the subjects of *Midcal* and of *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384 (1951)); *see also 324 Liquor*, 479 U.S. at 345 n.8 (noting that a New York law allowing liquor wholesalers to fix their own prices could be called a hybrid restraint); *Miller*, 813 F.2d at 1349-51 (finding a hybrid restraint where a statutory scheme

let wholesalers set prices that retailers were legally bound to honor).

**[13]** Such a scheme necessarily involves a delegation of market power to private parties that is *per se* illegal under the Sherman Act. *See Miller*, 813 F.2d at 1349-51 (*citing Fisher*, 465 U.S. at 267-68). Otherwise, the hybrid restraint could not be attacked as facially invalid. As we have already discussed, the MSA involves no such delegation of *per se* illegal power such as the ability to fix prices. *See* Part III.A *supra*. We must therefore conclude that the MSA cannot be classified as a hybrid restraint.[10] Accordingly, we decline to follow the Third Circuit and instead hold that the state is entitled to *Parker* immunity in this case.[11]

## C.   State law claims

**[14]** Sanders also brought claims under California antitrust law. California courts have held that the *Noerr-Pennington* immunity doctrine applies to protect private petitioners of the government from state-law antitrust liability in exactly the same way as it protects them from federal antitrust liability. *See Blank v. Kirwan*, 703 P.2d 58, 63-65 (Cal. 1985). Since *Noerr-Pennington* immunity shields the tobacco defendants from Sherman Act liability, it also shields them from state antitrust liability. *See PTI*, 100 F. Supp. 2d at 1196.

---

[10]The Sixth Circuit, in *Tritent*, reached a similar conclusion about the Kentucky version of the MSA scheme. The Sixth Circuit held that the *Rice v. Norman Williams Co.*, 458 U.S. 654 (1982), preemption analysis "must precede the analysis under the hybrid-restraint theory." *Tritent*, 467 F.3d at 558. Since the plaintiffs in *Tritent* had failed to demonstrate preemption, the Sixth Circuit declined to hold that the Kentucky version of the MSA scheme was a hybrid restraint. *Id.*

[11]The tobacco defendants argue that they, too, are entitled to *Parker* immunity. We need not reach this issue, since we have already held that they are entitled to immunity under the *Noerr-Pennington* doctrine.

**[15]** As for the State of California's liability under its own laws, the district court correctly noted that the California legislature could hardly have violated its own statutes by passing another statute. *See Sanders*, 365 F. Supp. 2d at 1104-05. Furthermore, the California courts have held that political divisions of the State of California are not subject to the Cartwright Act, which means that the state cannot be held liable for entering into the MSA. *See Blank*, 703 P.2d at 65.

D.   Conclusion

**[16]** Sanders has failed to show that the MSA implementing statutes are *per se* illegal under the Sherman Act. Sanders also has failed to show that any of the defendants are liable under either the Sherman Act or under California antitrust law. Sanders therefore has failed to state a claim entitling him to relief, and the district court properly dismissed his lawsuit.

**AFFIRMED.**