# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 15, 2010

No. 09-30492

Lyle W. Cayce
Clerk

XCALIBER INTERNATIONAL LIMITED LLC,

Plaintiff - Appellant

v.

ATTORNEY GENERAL STATE OF LOUISIANA, James "Buddy" Caldwell,

Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before BARKSDALE, GARZA, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Plaintiff-Appellant Xcaliber International Limited LLC ("Xcaliber") appeals the district court's grant of summary judgment in favor of the Attorney General of Louisiana (the "State"). Xcaliber manufactures and sells discount cigarettes. The case presents a challenge to an amendment to the state law implementing the tobacco settlement between the largest manufacturers of cigarettes and most of the states. Xcaliber claims that the amendment is preempted by federal antitrust law and violates the Equal Protection and Due Process Clauses.

No. 09-30492

**I**

Since 2003, Xcaliber has manufactured tobacco products and distributed them primarily in Louisiana, Kansas, and Oklahoma. Louisiana is one of many states that, during the mid-1990s, sued the country's largest tobacco manufacturers to recover health care costs related to smoking. In 1998 these states signed the Master Settlement Agreement (the "MSA"), which settled the litigation between them and four major tobacco manufacturers ("Original Participating Manufacturers" or "OPMs").

The MSA released OPMs from all tobacco-related legal claims initiated by the states. In return, each OPM agreed to make annual payments into a collective fund with each OPM's contribution determined primarily by multiplying an agreed sum that increased each year by each OPM's respective cigarette market share. The total of all payments was then to be allocated among the states based on a fixed formula, with Louisiana receiving approximately 2.26 percent of the total as its "allocable share." The MSA also placed various restrictions on each OPM. For example, it (1) banned political lobbying; (2) restricted trade association activities; (3) prevented legal challenges to various state tobacco laws; and, (4) prohibited some forms of advertising.

Other tobacco manufacturers were later given the opportunity to join the MSA. Those who did are referred to as Subsequent Participating Manufacturers ("SPMs"). SPMs that joined the MSA within ninety days were given special treatment (*i.e.*, "grandfathered in"). These "exempt" SPMs do not pay a per cigarette amount on current sales until those sales exceed the level of their 1998 sales or 125% of their 1997 sales. The combination of the OPMs and SPMs are collectively referred to as PMs (*i.e.*, participating manufactures). Tobacco manufacturers, like Xcaliber, that are not PMs are referred to as Non-Participating Manufacturers ("NPMs").

Standing alone, the MSA would put PMs at a cost disadvantage in comparison to NPMs since only the PMs are required to pay a per-cigarette amount under the terms of the MSA. As a result of the MSA, PMs must raise prices in order to stay profitable at a rate similar to the pre-MSA rate while satisfying their payments under the MSA. Thus, absent some mechanism to impose similar per-cigarette costs on NPMs, NPMs could sell at lower prices and potentially increase their market share.

To neutralize this effect, the MSA requires each state to enact legislation, which in Louisiana is codified at LA. REV. STAT. §§ 13:5061–5063. The statute requires every NPM selling cigarettes in Louisiana to either (1) become a PM under the MSA's terms, or (2) deposit money annually into an escrow account. *See* § 13:5063. The amount to be deposited is calculated by multiplying the numbers of cigarettes sold in the state by a fixed charge listed in the amended statute that increases over time. *See* § 13:5063(C)(1). The amount is roughly the same as that paid by PMs, currently .025 cents per cigarette. The interest accrued on the escrowed funds is paid out to the NPM, and the principal is either paid to Louisiana to satisfy a future judgment entered against such NPM, or returned to the NPM if twenty-five years pass without such a judgment. *See* § 13:5063(C)(2).

Until 2003, the statute also contained the following provision:

> (b) To the extent that a [NPM] establishes that *the amount it was required to place into escrow in a particular year was greater than the state's allocable share of the total payments that such manufacturer would have been required to make in that year under the [Agreement]*. . . had it been a [PM], the excess shall be released from escrow and revert back to such [NPM].

§ 13:5063(C)(2)(b) (emphasis added) (the "Original Escrow Provision"). The Original Escrow Provision created a loophole. An NPM could recover funds that it placed into escrow in a particular state to the extent that those funds exceeded

No. 09-30492

the amount the state would receive from that manufacturer as its allocable share, had the manufacturer been a PM. Thus, by concentrating its distribution to just a few states, an NPM could recover a greater percentage of the total money it placed into escrow because those states were allowed to retain only their relatively small percentage shares.[1]

In order to close this loophole, Louisiana, along with every settling state except Missouri, amended the Original Escrow Provision. It now reads:

> To the extent that a [NPM] establishes that *the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the [MSA] payments* . . . that such [NPM] would have been required to make on account of such units sold had it been a [PM], the excess shall be released from escrow and revert back to such [NPM].

LA. REV. STAT. § 13:5063 (C)(2)(b) (emphasis added) (the "Allocable Share Revocation" or "ASR"). The ASR establishes a limit on the amount of escrow funds that will be released back to an NPM in a particular year. By removing the "state's allocable share" language, the ASR limits the release to the amount the NPM would have paid as a PM on the same amount of sales, rather than the State's allocable share of this amount. For example, if an NPM makes half of its total sales in Louisiana, under the amendment, the NPM will be entitled to a release only to the extent that its escrow deposit exceeds what its MSA payment would have been on the number of cigarettes represented by half of its total

---

[1] If an NPM distributed its cigarettes nationally, and its distribution patterns approximated those of the national market, its payment obligations on its national sales would be apportioned 100 percent among the settling states, with the result that something close to 100 percent of its payments would, in the aggregate, be retained under the Original Escrow Provision. However, if an NPM were to concentrate its business to a single state, such as Louisiana, it would make 100 percent of its sales there and would be able to recoup the payments on all but roughly 2.26 percent, which is Louisiana's approximate allocable share. While the PMs would be required to continue 100 percent of their payments under the MSA, an NPM that focused on a single regional area could be virtually exempt from the payments, thereby gaining a competitive advantage.

No. 09-30492

sales. Instead of basing the escrow release on the fiction of national pay-in followed by a release based on the State's allocable share, the release is tied directly to the number of cigarettes actually sold in the State.

Because Xcaliber distributes products in only a few states, it formerly utilized the loophole in the original statute, but can no longer do so post-amendment. According to Xcaliber, as a result of the ASR, the barriers against NPMs have been heightened dramatically, and the ability of an NPM to compete within a regional market has been destroyed.

Xcaliber filed suit against the Louisiana Attorney General, seeking declaratory and injunctive relief based on violations of the First Amendment and the Commerce, Equal Protection, and Due Process Clauses, and the corresponding clauses of the Louisiana Constitution. Xcaliber sought only to prevent the enforcement of the ASR. It did not seek to invalidate the entire MSA and its implementing legislation. The district court dismissed each claim under Rule 12(b)(6). Xcaliber appealed,[2] and this court reversed and remanded. On remand, Xcaliber amended its complaint to add a claim that the ASR is in violation of, and preempted by, the Sherman Act. Both parties moved for summary judgment. The district court denied Xcaliber's motion and granted summary judgment in favor of the State. This appeal followed.[3]

## II

We review a district court's grant of summary judgment de novo. *Scottsdale Ins. Co. v. Knox Park Constr., Inc.*, 488 F.3d 680, 683 (5th Cir. 2007).

---

[2] Xcaliber did not challenge the dismissal of its Commerce Clause claim in the previous appeal. Therefore, that claim is no longer part of the suit.

[3] Xcaliber asserted no claim for direct relief under the First Amendment on summary judgment and does not advance a direct claim under the First Amendment on appeal. Also, Xcaliber's briefing on its Equal Protection and Due Process claims only discusses the United States Constitution. Accordingly, any separate arguments based on the Louisiana Constitution are waived. *See In re Texas Mortgage Servs., Inc.*, 761 F.2d 1068, 1073–74 (5th Cir. 1985).

No. 09-30492

We view all facts in the light most favorable to the non-movant, and affirm only when the evidence "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Coury v. Moss*, 529 F.3d 579, 584 (5th Cir. 2008). A genuine issue of material fact exists if the summary judgment evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III

### A

Xcaliber contends that the Sherman Act preempts the ASR. To determine whether a state statute is preempted by the Sherman Act, we apply a two-step analysis, as set forth by the Supreme Court in *Rice v. Norman Williams Co.*, 458 U.S. 654 (1982).[4] First, we inquire whether the state legislation "mandates or

---

[4] Xcaliber argues that *Rice* is not the correct standard and cites to other preemption cases that supposedly show that the proper inquiry is much broader. We find Xcaliber's complaints about *Rice* to be misguided. First, the preemption cases Xcaliber cites do not involve the Sherman Act. Because states are permitted to enact legislation that impacts competition without necessarily running afoul of the Sherman Act, see *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 64 (1982), the preemption analysis under the Sherman Act is different than the preemption analysis under other statutes. Second, even if *Rice* applies only to facial challenges, the point does not help Xcaliber because its complaint presents a facial challenge. Rather than seeking a private remedy against private parties or an injunction against enforcement of the statute in some specific, limited situation, Xcaliber seeks a declaratory judgment that the ASR is preempted by the Sherman Act and an injunction against the enforcement of the ASR in all situations. That is, Xcaliber claims the ASR is unconstitutional under the Supremacy Clause in its every application. Accordingly, we apply the *Rice* per se analysis rather than rule of reason analysis. *See Rice*, 458 U.S. at 661. We also note that the other courts that have considered a claim that the MSA or its related legislation is preempted by the Sherman Act have applied *Rice*. *See Grand River Enters. Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 936 (8th Cir. 2009); *KT & G Corp. v. Att'y Gen. of State of Okla.*, 535 F.3d 1114, 1126 (10th Cir. 2008); *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007), *cert. denied*, 128 S.Ct. 2427 (2008); *S & M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604, 628 (M.D. Tenn. 2005), *aff'd*, 228 Fed. App'x. 560; *Trident Int'l Corp. v. Ky.*, 467 F.3d 547, 554 (6th Cir. 2006); *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 222, *reh'g denied*, 363 F.3d 149 (2d Cir. 2004), *on remand*, *Freedom Holdings, Inc. v. Cuomo*, 592 F. Supp. 2d 684, 696 (S.D.N.Y. 2009), *appeal docketed*, No. 09-0547 (2d Cir. Feb. 10, 2009).

authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or . . . places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." *Id*. at 661. That is, we ask whether "the conduct contemplated by the statute is in all cases a *per se* violation." *Id*. Second, we consider whether the state statute is saved from preemption by the state action immunity doctrine. *See Id*. at 662 n.9 (citing *Parker v. Brown*, 317 U.S. 341 (1943)).

The only change effected by the ASR is to remove the language that tied the escrow release to the State's allocable share of tobacco settlement payments under the MSA. The ASR does not change how much an NPM must pay per cigarette, nor does it allow other market participants to change that amount. It only changes how much of the total amount paid is released back to the NPM. *See* LA. REV. STAT. § 13:5063 (C)(2)(b).[5]

Section 1 of the Sherman Act, which is the basis of Xcaliber's complaint, outlaws "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Section 1 addresses joint action by private parties that restrains trade. *See Parker*, 317 U.S. at 351. While the Act is not specific as to which types of conduct it prohibits, courts have found illegal a broad range of actions including monopolization, price fixing, territorial divisions, output restrictions, group boycotts, and refusals to deal. *See Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979); *White Motor Co. v.*

---

[5] We note that Xcaliber's Sherman Act argument is undermined by an obvious incongruity between its allegations and the relief it seeks. Xcaliber specifically limits its complaint to the ASR. We have difficulty understanding why an agreement implemented pursuant to the MSA, but inadvertently advantageous to Xcaliber, would be acceptable while a modification of that same scheme that closes a loophole would violate antitrust law and be preempted. It would seem that Xcaliber's logic would require us to invalidate the entire statutory structure implementing the MSA rather than just the ASR. A related Fifth Circuit case for which oral argument was recently held presents a challenge to the MSA itself. *See S&M Brands Inc. v. James Caldwell*, No. 09-30985.

No. 09-30492

*United States*, 372 U.S. 253, 260 (1963); *United States v. Griffith*, 334 U.S. 100, 106–07 (1948); *Associated Press v. United States*, 326 U.S. 1, 12–13 (1945); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 (1940). These activities are considered pernicious to competition and, with the exception of monopolization, are generally considered per se violations of the antitrust laws.

Given the traditional scope of antitrust violations and the limited effect of the ASR, we cannot say that the ASR "mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases." On its face, the ASR does not force or allow private parties to collude, set prices, divide markets, or in any other manner violate antitrust law. The ASR simply alters the amount of money to be refunded to NPMs by changing how much of the NPMs' annual escrow payments are released. We agree with the Tenth Circuit, see *KT&G*, 535 F.3d at 1128, that nothing in the text of the ASR removes from tobacco manufacturers the ability to unilaterally set their own prices for products or determine their output. *See also Grand River*, 574 F.3d at 938; *Sanders*, 504 F.3d at 911; *Tritent*, 467 F.3d at 557. Accordingly, we have little trouble concluding that the ASR does not "mandate or authorize conduct that necessarily constitutes a violation of the antitrust laws in all cases." *Rice*, 458 U.S. at 661.

Likewise, we cannot say that the ASR "places irresistible pressure on a private party to violate the antitrust law in order to comply with the statute." *Id*. Since the ASR does not affect PMs, the only parties potentially facing "irresistible pressure" from the ASR are NPMs. Although the ASR forces NPMs to charge a higher price for their products to maintain the same level of profitability, it does not pressure them to conspire together to set a specific price, to carve up markets, or otherwise to violate antitrust law. *See Sanders*, 504 F.3d at 911. Neither the plain language of the Sherman Act nor the courts' interpretation of it necessarily equate charging a higher price with violating

8

antitrust law. Moreover, we do not understand Xcaliber to argue that it is somehow pressured into violating the antitrust laws.[6] Since the only parties affected by the ASR are not violating the antitrust laws—indeed, even according to Xcaliber, NPMs are the *victims* of other parties' violations of the antitrust laws rather than the violators—it follows that the ASR does not irresistibly pressure private parties to violate the antitrust laws in order to comply with the statute.

## B

Xcaliber also contends that the ASR violates the Sherman Act under a hybrid restraint analysis.[7] A hybrid violation arises when "what appears to be a state[-] . . . administered price stabilization scheme is really a private price-fixing conspiracy, concealed under a 'gauzy cloak of state involvement.'" *Fisher v. City of Berkeley, Cal.*, 475 U.S. 260, 269 (1986) (citing *Cal. Retail Liquor Dealers Ass'n. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 106 (1980)). Although governmental intrusions into the market are generally acceptable, see *id.* at 264, "[n]ot all restraints imposed upon private actors by government units

---

[6] Rather, as discussed *infra*, Xcaliber alleges that the ASR effectively allows the PMs to conduct their business as though they were part of an output cartel, thereby destroying competition and forcing NPMs from the market.

[7] The case law is not entirely clear as to whether the hybrid restraint analysis is a separate means of satisfying *Rice*'s per se violation requirement or another means of addressing *Parker* state-action immunity under the second prong of *Rice*. *Compare Fisher v. City of Berkeley, Cal.*, 475 U.S. 260, 267–70 (1986) (concluding that a housing ordinance was not a hybrid restraint and therefore not addressing whether the ordinance would be exempt from antitrust scrutiny under the *Parker* state-action doctrine), *and KT&G*, 535 F.3d at 1133 (declining to address the state-action doctrine after having found no hybrid restraint in a case essentially identical to this case), *with Cal. Retail Liquor Dealers Ass'n. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 103–06 (1980) (addressing concepts that later courts have treated as elements of the hybrid restraint analysis as part of discussion of *Parker* state action immunity, after having found a per se violation), *and Sanders*, 504 F.3d at 911 (finding no per se violation under *Rice* but addressing *Parker* state-action immunity through a discussion of cases generally associated with the hybrid restraint analysis).

necessarily constitute unilateral action outside the purview of § 1." *Id.* at 267. When the government's action grants "private actors . . . a degree of private regulatory power," it is a "nonmarket mechanism merely enforc[ing] private marketing decisions" and thus not immunized from the antitrust laws. *Id.* at 268.

The cases that have found violations of the antitrust laws based on hybrid restraints have dealt with situations in which the government gave regulatory authority to private parties. As the Ninth Circuit has noted, the hybrid restraint cases "hinged on a state's decision to let producers dictate market conditions to others—for example, by 'posting' prices that then became legally binding on buyers and other producers." *Sanders*, 504 F.3d at 918 (referencing *Fisher*, 475 U.S. 260; *Midcal*, 445 U.S. 97; *324 Liquor Corp. v. Duffy*, 479 U.S. 335 (1987); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384 (1951)). Here, since the ASR establishes a state regulatory scheme that does not require or allow any input from private parties, it cannot be classified as a hybrid restraint. *See Grand River*, 574 F.3d at 939; *KT & G*, 535 F.3d at 1131; *Sanders*, 504 F.3d at 919.

## C

Although we could conceivably end our preemption analysis at this point, see *Rice*, 458 U.S. at 662 n.9; *KT&G*, 535 F.3d at 1133, we nonetheless address Xcaliber's state-action immunity argument because neither the first prong of *Rice* nor the hybrid restraint analysis fully captures Xcaliber's argument. Xcaliber alleges that the ASR, together with the MSA and statutes implementing it, enables and implements an output cartel whose purpose and effect is to protect PM's market shares and drive NPMs out of business, all resulting in raising prices to supra-competitive levels. In effect, Xcaliber alleges that the OPMs are using Louisiana to impose a private anti-competitive conspiracy. According to Xcaliber, Louisiana acted entirely at the behest of the

No. 09-30492

OPMs, which exercised control over Louisiana via the threat of reduced payments under the MSA if Louisiana refused to enact the ASR.

Absent some provision for imposing similar costs on NPMs, the MSA would put PMs at a competitive disadvantage since, under the MSA, PMs are required to make per-cigarette payments, which increase their cost of doing business. Without the burden of these additional costs, NPMs would, all things being equal, be able to charge lower prices and increase their market share. With the express purpose of counteracting this effect, see LA. REV. STAT. § 13:5061(6),[8] Louisiana passed statutes that effectively require the NPMs either to raise their prices to cover their escrow payment obligations—which has the effect of prohibiting the NPMs from undercutting the PMs' prices—or to abandon the Louisiana market.

Thus, we have no doubt that Louisiana purposefully sought to increase the costs of NPMs to a level comparable to those faced by PMs.[9] The Original Escrow Statute failed to accomplish that purpose, and Louisiana passed the ASR to rectify the problem. However, the critical issue is not whether Louisiana

---

[8] LA. REV. STAT. § 13:5061(6) provides:

It would be contrary to the policy of this state if tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the state will have an eventual source of recovery from them if they are proven to have acted culpably. It is thus in the interest of the state to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise.

[9] Since the ASR explicitly aimed, at least in part, at counteracting the competitive advantage that NPMs would enjoy absent some mechanism for enforcing per-cigarette costs on NPMs, the analysis does not turn on whether Xcaliber presented sufficient evidence of anticompetitive effect to survive summary judgment. Indeed, for purposes of our antitrust analysis, we assume that Xcaliber has demonstrated that the ASR increases the costs of NPMs, at least in part, in order to undermine their competitive advantage over PMs.

11

sought to impair the competitiveness of the NPMs, but whether Louisiana runs afoul of federal antitrust law by doing so.

A state statute is not preempted merely "because the state scheme might have an anticompetitive effect." *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 64 (1982); *Rice*, 458 U.S. at 659; *KT & G*, 535 F.3d at 1129. If any conflict between a state law and the Sherman Act meant that the state law were preempted, "the States' power to engage in economic regulation would be effectively destroyed." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 133 (1978). This cannot be the case, for as the Court has recognized, "the function of government may often be to tamper with free markets, correcting their failures and aiding their victims." *Fisher*, 475 U.S. at 264. State police powers and regulatory authority extend legitimately to a range of anticompetitive schemes.[10] The ASR, like these other regulations, alters the competitive environment for market participants.

As the Court noted in *Parker*, "[t]he Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state." 317 U.S. at 351. The Court highlighted that the Sherman Act applies to "persons" rather than states and aims "to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations." *Id.* However, the Court also said that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Id.* (citations omitted).

Xcaliber alleges that the entire regulatory structure created by the MSA, its implementing legislation, and the ASR represents a private conspiracy enacted by the legislature at the behest of the OPMs. That is, the legislature,

---

[10] Obvious examples include public utilities, zoning ordinances, and enterprise zones.

No. 09-30492

by passing the legislation, attempted to authorize a private conspiracy that would clearly violate the antitrust laws but for the State's involvement.[11]

As evidence that the Louisiana legislature acted at the OPMs' behest in passing the ASR, Xcaliber points to the timing of the legislation, which was passed soon after it began appearing as a talking point in the corporate

---

[11] Although Xcaliber brought suit only against the State, its antitrust theory essentially requires us to find that Louisiana is authorizing conduct that would be illegal as a private conspiracy. By asserting a theory that depends on private violations in a suit against the State, Xcaliber has muddled the various lines of antitrust authority from the Supreme Court. As a result of this confusion, Xcaliber has placed undue emphasis on the State's failure to address the two-prong test established in *Midcal*. As explained in *Sanders*:

> A series of Supreme Court cases holds that any action in restraint of trade is only immune [on state-action grounds] if it satisfies a two-part test: The anticompetitive policy not only must be (1) "clearly articulated and affirmatively expressed as state policy," but also must be (2) "actively supervised by the state itself." *Midcal*, 445 U.S. at 105 (quoting *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 410 (1978) (plurality opinion)) (internal quotation marks omitted); *see also 324 Liquor*, 479 U.S. at 343–44; *Patrick v. Burget*, 486 U.S. 94, 100 (1988); *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 631 (1992). Other Supreme Court cases, however, explicitly hold that a state's own acts in the antitrust area are always immune; these cases suggest that the two-part "*Midcal* test" is only needed to decide whether private conduct pursuant to a state statute gets *Parker* immunity. In other words, a state need not show it "actively supervises" private parties, as long as the state itself, acting as sovereign, created the restraint of trade. *See Hoover v. Ronwin*, 466 U.S. 558, 568–69 (1984); *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 377–79 (1991).

504 F.3d at 915–16 (citations altered); *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46 (1985) (declining to impose active supervision requirement when defendant was a municipality); *see also Earles v. State Bd. of Certified Pub. Accountants of La.*, 139 F.3d 1033, 1040–42 (5th Cir. 1998) (recognizing that different state-action test applies based on the status of the defendant); *Indep. Taxicab Drivers' Employees v. Greater Houston Transp.*, 760 F.2d 607, 610 n.5 (5th Cir. 1985) (same). We find the Ninth Circuit's explanation of why *Hoover* rather than *Midcal* should apply to cases challenging a state's action in passing the MSA and its implementing legislation to be persuasive. *See Sanders*, 504 F.3d at 917–18; *see also Grand River*, 574 F.3d at 939–41. Thus, Xcaliber's arguments that the State is not entitled to the protection of the state-action doctrine because it has failed to satisfy both of the *Midcal* prongs are unavailing. The State is immune from antitrust liability unless the passage of the ASR was an attempt to "give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Parker*, 317 U.S. at 351.

13

literature of the OPMs. *See Freedom Holdings, Inc. v. Spitzer*, 447 F. Supp. 2d 230, 259–60 (S.D.N.Y. 2004). Xcaliber also points out that Louisiana would risk losing substantial amounts of money due under the MSA if it refused to pass the ASR. Xcaliber quotes commentary from the Louisiana House floor that the ASR had to be passed exactly as written. According to Xcaliber, this evidence demonstrates that the ASR is plainly not a unilateral, sovereign act, but rather was passed at the insistence of OPMs in order to continue their control of the market.

Xcaliber's evidence, however, amounts to little more than speculation. Louisiana has articulated its reasons for entering into the MSA and how the ASR advances its goals. *See* LA. REV. STAT. § 13:5061. The actual effect of the statute seems to bear out the legislature's belief that the ASR would further its expressly stated goals. The MSA has brought about a substantial reduction in cigarette consumption and substantial reimbursements to the states for the public costs of cigarette consumption. By implementing the ASR, Louisiana has ensured these beneficial achievements are not corrupted by allowing NPMs to sell cigarettes at prices unburdened by any payment obligation, and potentially to dodge liability by closing up shop and selling elsewhere. Louisiana has articulated reasonable goals, linked to its public health needs, that support its decision to pass the ASR.

Although we recognize that Louisiana was under considerable financial pressure to pass the ASR, we are extremely hesitant to embrace an argument that depends on our finding that the tobacco lobby captured the Louisiana legislature. Although PMs may have lobbied in favor of passing the ASR, it does not follow that the Louisiana legislature acted solely at their behest or that lobbying itself can be the basis of a Sherman Act violation. Indeed, in addressing private parties' violations of the Sherman Act, the Court has noted that "[n]o violation can be predicated upon mere attempts to influence the

passage or enforcement of laws." *Eastern R.R. Presidents Conference v. Noerr Motor-Freight, Inc.*, 365 U.S. 127, 135 (1961). The Court continued:

> [W]here a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out. These decisions rest upon the fact that under our form of government the question of whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government so long as the law itself does not violate some provision of the Constitution.

*Id.* at 136 (internal citations omitted). Although we recognize that the *Noerr-Pennington* doctrine, see *Noerr*, 365 U.S. 127; *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), is not entirely applicable to the instant case, we nonetheless find that it supports our reasoning. It would be highly incongruous for a private party to be immune from antitrust liability predicated on its attempts to influence the legislature, but for the legislature to run afoul of antitrust law when it passes a statute after lobbying by private parties. *See Hoover*, 446 U.S. at 579–80 ("[W]here the action complained of . . . was that of the State itself, the action is exempt from antitrust liability regardless of the State's motives in taking the action.").

In conclusion, we hold that the district court correctly granted summary judgment in favor of the State on Xcaliber's Sherman Act claim.

## IV

Xcaliber contends that the ASR violates the Equal Protection Clause. According to Xcaliber, we should review the statute under strict scrutiny because the ASR coerces Xcaliber into relinquishing its First Amendment rights to freedom of speech, association, and petition.[12] The basic argument is that the ASR makes doing business as an NPM so unattractive that it compels NPMs to

---

[12] The State has not disputed Xcaliber's claim that joining the MSA would burden Xcaliber's First Amendment rights. We assume without deciding that joining the MSA would in fact burden Xcaliber's First Amendment rights.

join the MSA, thereby waiving their First Amendment rights. Xcaliber also argues that even if strict scrutiny does not apply, the ASR nonetheless violates the Equal Protection Clause under rational-basis review.

Xcaliber contends that it presented the district court with sufficient evidence of compulsion to join the MSA to be granted summary judgment, or, at the least, to preclude summary judgment for the State. The evidence falls into two broad categories: price and non-price. Regarding price, Xcaliber claims that it demonstrated that NPMs pay a higher cost per cigarette than PMs generally, and a much higher cost than the exempt SPMs. Xcaliber also contends that PMs pay less than the amounts they theoretically owe under the MSA because they are able to withhold payments based on disputes over adjustments built into the MSA. Regarding non-price coercion, Xcaliber contends that it demonstrated: the large scale exclusion of NPMs from retail outlets based on retailers' and distributors' unfounded fear of potential liability; the greater administrative costs associated with escrow compliance for NPMs than for PMs complying with the MSA; the inability of NPMs to dispute and withhold payments, which is a routine practice of PMs; and the harm flowing from Louisiana's policy of holding escrow deposits in accounts generating extremely low interest rates.

Regarding price, according to the plain language of the ASR, Xcaliber is entitled to a refund for any amount it deposits greater than the payment it would have made as a PM. *See* LA. REV. STAT. § 13:5063 (C)(2)(b). If Xcaliber's allegations are true and NPMs are indeed paying more, Louisiana has provided Xcaliber with a remedy under the ASR. Nevertheless, Xcaliber has chosen not to pursue that remedy and instead asked us to invalidate the ASR on constitutional grounds. Under these circumstances, a federal court, properly mindful of fundamental principles of state sovereignty and constitutional avoidance, must be extremely hesitant to strike down a state statute on constitutional grounds when such a drastic remedy may not be necessary. *See*

No. 09-30492

*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975) ("[W]hen considering a facial challenge it is necessary to proceed with caution and restraint, as invalidation may result in unnecessary interference with a state regulatory program.").

Xcaliber's allegations of non-price coercion are undermined by the limited relief it seeks. Because Xcaliber seeks only to invalidate the ASR and not the entire MSA statutory structure, the relevant comparison is not simply between NPMs under the ASR and PMs. We also must consider how granting the relief sought would remedy the harms of which Xcaliber complains. That is, we must also compare NPMs under the ASR with NPMs under the Original Escrow Statute. Having done so, it is apparent that none of the non-price coercion that Xcaliber alleges would be remedied by a declaratory judgment that the ASR is unconstitutional. Even without the ASR, NPMs would still face exclusion from retail outlets, bear greater administrative costs, and be unable to dispute payments. Similarly, Louisiana would still hold the escrow deposits in accounts generating the same interest rates.[13] Because the non-price coercion of which Xcaliber complains will exist whether or not we declare the ASR unconstitutional, we do not consider it an adequate reason for subjecting the ASR to heightened constitutional scrutiny.

A statute is only subject to heightened scrutiny on an Equal Protection challenge if it "proceeds along suspect lines [or] infringes fundamental constitutional rights." *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Since we are not persuaded by Xcaliber's arguments implicating the First Amendment, Xcaliber's Equal Protection claim is subject to rational-basis review. *Id.* Under rational-basis review, the ASR "must be upheld against equal

---

[13] This reasoning also undermines Xcaliber's complaints about the PMs' ability to withhold disputed payments and the treatment of the exempt PMs, which exist regardless of whether or not the ASR is in effect.

protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.*

We agree with the other circuits who have addressed this issue, see *Grand River*, 574 F.3d at 944–45; *KT&G*, 535 F.3d at 1137–40, and hold that the ASR does not violate the Equal Protection Clause under rational-basis review. Louisiana has articulated several reasons for passing the MSA legislation, see LA. REV. STAT. § 13:5061(1)–(5), and explained why the ASR is important to furthering the goals of the MSA. *See id.* § 13:5061(6). This explanation is easily sufficient to uphold the ASR under rational-basis review. *See KT&G*, 535 F.3d at 1140 (citing numerous cases that have upheld the MSA and its related statutes against Equal Protection claims).

## V

Xcaliber contends that the ASR violates the Due Process Clause. Relying principally on *Bell v. Burson*, 402 U.S. 535 (1971), Xcaliber argues that a deprivation based on a future, hypothetical finding of judicial liability is an adjudicative deprivation that requires pre-deprivation process directed at determining whether the liability actually exists. According to Xcaliber, since the ASR does not provide any pre-deprivation process, it violates the Due Process Clause.

This issue turns on whether the state action prompting the escrow payments is properly characterized as legislative or adjudicative. Generally speaking, legislative actions are non-individualized determinations that affect a wider class of individuals, whereas adjudicative actions involve individualized assessments that affect a smaller number of people in a more exceptional manner. *Compare Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915), *with Londoner v. Denver*, 210 U.S. 373, 385 (1908); *see also Jackson Court Condominiums, Inc. v. City of New Orleans*, 874 F.2d 1070, 1074 (5th Cir. 1989); *United States v. LULAC*, 793 F.2d 636, 648 (5th Cir. 1986).

18

In *Bell*, the Court evaluated a Georgia statute that suspended an uninsured motorist's vehicle registration and driver's license when that motorist was involved in an accident, unless the motorist first posted security to cover the amount of damages claimed by the aggrieved parties in the accident reports. The Court held that the statute deprived the uninsured motorist of property without due process. *See Bell*, 402 U.S. at 542. The Court made clear, however, that "[i]f the statute barred the issuance of licenses to all motorists who did not carry liability insurance or who did not post security, the statute would not, under our cases, violate the Fourteenth Amendment." *Id*. at 539.

According to the State, the ASR does not offend *Bell* because it imposes a security-posting requirement on all cigarette manufacturers that have not settled their potential liability to the State. Xcaliber argues that the "generally applicable" exception does not apply because the escrow provisions are limited to NPMs. Although Xcaliber is correct that the ASR applies only to NPMs, it does not follow that the statute is not generally applicable. Since the PMs have agreed to make payments in exchange for a release from liability, the NPMs are the only potentially liable parties. The ASR generally applies to all NPMs, the only manufacturers that may in the future be found liable to the State for the damages inflicted by their products. *See KT&G*, 535 F.3d at 1141–42.

The problem in *Bell* was not that liability was generally involved, but that the payments were tied to specific accidents, and therefore to actual liability. Under the statute at issue in *Bell*, uninsured motorists were required to post security *after* they had been in an accident. 402 U.S. at 535. Because the posting of security essentially turned on an assessment of the individual's fault in causing the accident, liability was an important factor in the deprivation. *See Logan v. Zimmerman*, 455 U.S. 422, 433 (1982) (quoting *Bell*, 402 U.S. at 541). By contrast, the ASR requires NPMs to create an escrow account as a precondition to selling cigarettes in Louisiana. Although the payout of escrowed

funds to satisfy a judgment will ultimately depend on an individualized assessment of liability, the initial depositing of funds does not.  Put differently, "the escrow reserves are not specific to any particular litigation; rather, they are legislative preconditions for the privilege of engaging in future cigarette sales in the individual states." *Grand River*, 425 F.3d at 174.

Since we conclude that Louisiana's decision to require NPMs to make escrow deposits is legislative in character, no further process is required, see *Jackson Court Condominiums*, 874 F.2d at 1074, and Xcaliber's argument fails.

## VI

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the State.